**KPH CONSOLIDATION, INC. d/b/a Columbia Kingwood Medical Center, Appellant,**

**v.**

**Dolores ROMERO, Individually and on Behalf of Incapacitated Plaintiff Ricardo Romero, and as Next Friend of Ricardo Romero, Jr., a Minor, Jennifer Romero and Joanna Romero, Appellees.**

No. 14–00–01177–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 9, 2003.

Rehearing Overruled April 24, 2003.

Michael A. Hatchell, Tyler, Richard A. Sheehy, Russell H. McMains, Houston, for appellant.

Richard P. Hogan Jr., Richard Warren Mithoff, Houston, for appellees.

Panel consists of Chief Justice BRISTER, Justices FOWLER and SEYMORE.

## OPINION

WANDA McKEE FOWLER, Justice.

Appellant, KPH Consolidation, Inc., d/b/a Columbia Kingwood Medical Center ("Hospital"), appeals a $23 million judgment against it based in part on the jury's finding that the Hospital acted maliciously when it credentialed Dr. Merrimon Baker. The suit was filed by a patient of Dr. Baker who suffered severe neurological and physical impairments after an operation Baker performed. For two reasons, we conclude the judgment must be reversed and rendered on the malice claim, and reversed and remanded on the negligence claim. First, the record reveals no evidence showing that the Hospital acted with malice—specifically with conscious indifference—when it credentialed Dr. Baker and therefore, the jury should not have been asked about actual malice. Second, because the jury found that the Hospital acted with malice, this finding forms at least part of the basis for the jury's award of actual damages, requiring us to reverse all of the damages.

## I. PROCEDURAL HISTORY.

Ricardo Romero and his family brought this suit to redress severe neurological and physical injuries Mr. Romero suffered as a result of surgery Baker performed. The Romeros sued Baker, a group of anesthesiologists, a certified nurse-anesthetist, and the Hospital.

Before trial, the Romeros settled with the doctors; at trial the only defendants were the nurse-anesthetist and the Hospital.

The Romeros' claims against the Hospital were based on two theories. However, the only one at issue here is their claim that the Hospital acted with malice by credentialing Baker to practice medicine at the Hospital—even though it knew that he abused prescription drugs and was an incompetent surgeon.[1]

The jury found that the Hospital acted with malice in granting and maintaining Baker's credentials, and that the Hospital, Baker, and one of the anesthesiologists, Dr. Huie, were negligent. It assessed 40% of the fault to Baker, 20% to Dr. Huie, and 40% to the Hospital; it awarded $40,600,000 in damages against all parties. The jury's award included a finding that the Hospital should pay Mr. Romero and Mrs. Romero a total of $12,000,000 in punitive damages.

The trial court rendered judgment against the Hospital for $11,440,000 in actual damages.

## II. FACTUAL BACKGROUND.

We will briefly review the surgery itself, then, because the Hospital challenges only the malicious credentialing finding, the remainder of the fact section will focus on two factual issues that control the outcome of that claim: the Hospital's credentialing process and the decision to credential Baker.

### A. THE SURGERY.

Ricardo Romero was referred to Baker for back surgery. During surgery, Romero experienced significant blood loss. In fact, Romero lost almost all the blood in his body. Shortly after a blood transfusion, he went into cardiac arrest and had to be resuscitated. He suffered severe brain damage that left him totally disabled.

---

1. The other theory was based on negligence and alleged that the Hospital was negligent in its delivery of blood products to the operating room.

## B. The Credentialing Process and Confidentiality.

Barbara Pickett, the Director of Quality and Resource Management at the Hospital, testified regarding the credentialing process. As she explained, physicians applying for privileges are required to complete an extensive questionnaire and provide peer recommendations. The Hospital verifies the information the applying doctor provides, checks the peer recommendations, reviews licenses in other states, and contacts various agencies, including the Texas Board of Medical Examiners, the Department of Public Safety, and the Drug Enforcement Agency. The information gathered is reviewed by the chairman of the surgery department, who recommends to the Medical Executive Committee whether to grant credentials. The Medical Executive Committee then reviews the applicant's credentials and makes a recommendation to the Hospital's Board of Trustees; it makes the final decision.

Both Pickett and Dr. Robert Rosen, a former member of the Hospital's surgery committee, testified that the communications and deliberations of the Medical Executive Committee are confidential. They explained that the purpose of confidentiality is to promote free discussion about the quality of medical treatment by doctors at hospitals. Dr. Ronald Kerr, former Chief of Staff of the Hospital, testified that the privilege is also beneficial for patients, because rumors or speculation could have an adverse impact on the relationship between a doctor and a patient.

Here, the Hospital asserted the privilege for committee communications and deliberations concerning Baker's staff privileges.[2]

## C. Credentialing Dr. Baker.

Because the Hospital chose to rely on the committee confidentiality privilege, we know from other sources only three specific facts concerning Baker's application to be placed on staff and two facts regarding his departure from the Hospital's staff. First, Baker applied for privileges at the Hospital in February of 1993. Second, he was given provisional status in February of 1994. Third, he was granted active staff privileges at the Hospital in 1996.

As for his departure, we know from deposition testimony of Baker that he was suspended after the Romero surgery while the incident was investigated. We also know that he did not reapply for staff privileges after they expired in the fall of 1998.

## III. ISSUES RAISED ON APPEAL.

On appeal, the Hospital raises issues in six categories; however, we address only one of them because it disposes of the entire case. In that issue, the Hospital claims the evidence is legally and factually insufficient to support the malicious credentialing claim. Two components of the issue are relevant to this appeal: first, the evidence was legally and factually insufficient to show that the Hospital acted with malice when it granted Baker's credentials and allowed him to retain those credentials; and second, because the jury found malice, the whole case—including the actual damages based on negligence—must be reversed because we cannot determine if the jury based its damages award or percentage allocation of liability on its malice finding.

---

2. But, in spite of the Hospital's assertion of the privilege, expert testimony from both plaintiff's and defendants' experts showed what information the Hospital would have known about Baker when it credentialed him—even though we do not know what the committee said or did in response to the information.

## IV. MALICIOUS CREDENTIALING.

Before we can review the evidence presented at trial, the issues the Hospital raises require us to review two areas of the law that impact our decision: (1) the legal requirements—both at trial and on appeal—of a malicious credentialing claim, and (2) the confidentiality privilege afforded to the Hospital by statute.

### A. THE LEGAL REQUIREMENTS AND APPELLATE REVIEW OF A MALICIOUS CREDENTIALING CLAIM.

 Malicious credentialing is a cause of action against a hospital for acting with malice in credentialing a doctor or in peer review. In *St. Luke's Episcopal Hospital v. Agbor*, 952 S.W.2d 503, 506 (Tex.1997), the Texas Supreme Court held that before a health care entity can be liable for actions taken during peer review—including credentialing—malice must be shown.[3] The heart of a malicious credentialing claim is proof of malice. Here, the court gave the jury the definition of malice contained in section 41.001(7)(B) of chapter 41 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B). That chapter applies to all causes of action in which a party seeks exemplary or punitive damages. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.002(a). Accordingly, we first review the definition of malice, then consider the quality of evidence necessary to prove malice, and finally consider the standard of review.

### 1. The Definition of Malice.

 Generally, the definition of malice under section 41.001(7)(B) consists of two components—one objective, one subjective. *North American Van Lines, Inc.*

*v. Emmons*, 50 S.W.3d 103, 127 (Tex.App.-Beaumont 2001, no pet) (citing *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325–26 (Tex.1993)). Objectively, the defendant's conduct must involve an extreme risk of harm, a significantly higher threshold than the objective reasonable person test for negligence. *Id.* Subjectively, the defendant must have actual awareness of the extreme risk created by the conduct. *Id.* (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex.1994)). Evidence of simple negligence is not enough to prove either the objective or subjective components of malice. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998); *Emmons*, 50 S.W.3d at 127.

The exact statutory definition that applies here provides that "malice" means the following:

an act or omission:

(i) which, when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B).

### 2. The Quality of Evidence Necessary to Prove Malice.

As for the quality of evidence necessary to prove malice, four issues relevant here have been discussed in the case law: (1) the objective requirement that an act must

---

3. The *Agbor* Court's decision was based upon its interpretation of sections 5.06(*l*) and (m) of the then-existing codification of the Texas Medical Practice Act. *See* Act of June 1, 1987, 70th Leg., R.S., ch. 596, § 18, 1987 Tex. Gen. Laws 2325, 2335 (repealed 1999) (current version at TEX. OCC.CODE ANN. § 160.010 (Vernon Supp.2002)).

involve an "extreme degree of risk" to qualify as malice; (2) the subjective requirement that a defendant, with "actual, subjective awareness" of the risk, proceeds with "conscious indifference" to the rights, safety, or welfare of others; (3) the need to present evidence that is clear and convincing; and (4) the type of evidence—direct or circumstantial—that may be used to prove the claim.[4] We will briefly review each one.

■ We turn first to the objective requirement that the act involve an "extreme degree of risk." This requirement, being a function of both the magnitude and the probability of the potential injury, is not satisfied if the defendant's conduct merely creates a remote possibility of serious injury; rather, the defendant's conduct must create the "likelihood of serious injury" to the plaintiff. *Universal Servs. Co., Inc. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995). The Supreme Court explained this concept in *Moriel:*

> Determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. In every negligence or gross negligence case, some injury has allegedly occurred. However, the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior.... If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great

danger. In such a case, punitive damages are not appropriate.

*Moriel,* 879 S.W.2d at 23.

■ We turn next to the subjective requirement of "actual, subjective awareness" and "conscious indifference." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B)(ii). Both elements must be met. *See General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 596 (Tex.1999); *Moriel,* 879 S.W.2d at 22. To uphold the jury's finding, we must conclude that the Hospital knew about the peril, and that its acts or omissions demonstrated it did not care. *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex.2001); *Ellender,* 968 S.W.2d at 921.

■ Third, just as malice requires something more than the typical negligence claim, the quality of evidence presented at trial also is greater than in a regular negligence claim. The evidence necessary to prove the two prongs must be "clear and convincing." TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(2). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 41.001(2); *Moriel,* 879 S.W.2d at 31.

The fourth issue also involves a quality issue concerning the evidence: can a plaintiff rely on circumstantial evidence to prove malice? Here, because the Hospital maintained its privilege throughout the litigation, the Romeros were unable to obtain direct evidence of committee documents or direct evidence of discussions regarding Baker's credentialing process. Instead, they attempted to demonstrate through

---

**4.** The definition of malice under section 41.001(7)(B) of the Texas Civil Practice and Remedies Code mirrors the Texas Supreme Court's definition of gross negligence in *Mor-* *iel.* *See Moriel,* 879 S.W.2d at 23. Therefore, the case law addressing gross negligence informs our analysis of the quality of the evidence required to prove malice.

circumstantial evidence what the Hospital knew or should have discovered in the credentialing process.

 Both the objective and subjective prongs of malice can be proven by circumstantial evidence. *See Harrison,* 70 S.W.3d at 785; *Ellender,* 968 S.W.2d at 921. Circumstantial evidence may prove any material fact, so long as it transcends mere suspicion. *Lozano v. Lozano,* 52 S.W.3d 141, 149 (Tex.2001) (Phillips, C.J., concurring and dissenting). The material fact must be reasonably inferred from the known circumstances.[5] *Id.* However, it may not be proved by unreasonable inferences from other facts and circumstances or by piling inference upon inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1968). Later, when we review the evidence, we will consider the Hospital's more specific claims that, although circumstantial evidence may be used, the Romeros' cause of action fails because they did not have direct evidence of (1) specific facts the credentialing committee knew or did not know and (2) how the committee responded to the information.

### 3. The Standard of Review.

 For a finding of malice to be sustained on appeal, legally sufficient evidence must show both that the act was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *See Moriel,* 879

S.W.2d at 22; *Emmons,* 50 S.W.3d at 128. Evidence of malice is legally sufficient if, considered as a whole in the light most favorable to the prevailing party, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Harrison,* 70 S.W.3d at 785; *Sanchez,* 997 S.W.2d at 595; *Moriel,* 879 S.W.2d at 25.[6]

 In conducting a factual sufficiency review under the "clear and convincing" standard required to sustain a finding of malice, we must determine whether the evidence in the record is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations sought to be established. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(2); *In re C.H.,* 89 S.W.3d 17, 26 (2002). Evidence of ordinary negligence alone is not enough to establish malice. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(b); *Emmons,* 50 S.W.3d at 128.

### B. THE STATUTORY CLOAK OF CONFIDENTIALITY.

 Having reviewed the legal issues concerning a malicious credentialing claim, and the definition contained in the Civil Practice and Remedies Code, we now turn to two different code provisions that greatly impact the success of a malicious credentialing claim. The statutes, which are contained in the Texas Occupations Code and the Health and Safety Code, provide

---

5. Additionally, the jury charge in this case included an instruction that "[a] fact may be established by direct or circumstantial evidence or both." Because the Hospital did not object to this instruction as submitted in the charge, the evidence is reviewed in light of the charge as given. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001).

6. The Hospital urges us to apply the less deferential standard of review articulated in *Turner v. KTRK Television, Inc.,* 38 S.W.3d

103 (Tex.2000), in which the Court held that federal constitutional law mandated a standard of review higher than the typical "no-evidence" or legal sufficiency standard in a public figure defamation case in which actual malice must be proved by clear and convincing evidence. The Hospital identifies no similar constitutional dimension in the present case; we therefore decline to apply a heightened standard of review.

the Hospital and its doctors a confidentiality privilege. This privilege cloaks all proceedings and records of a credentialing body in secrecy. The Texas Occupations Code provides for this privilege, stating that "each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged."[7] TEX. OCC.CODE ANN. § 160.007. The Health and Safety Code also provides that the records and proceedings of a medical committee are confidential and are not subject to court subpoena. TEX. HEALTH & SAFETY CODE ANN. § 161.032. These provisions are based on two premises: first, exacting, critical peer review of doctors' competence and performance results in improved standards of medical care;[8] and second, an atmosphere of confidentiality is required for candid, uninhibited communication of such critical analysis within the medical profession. *See Memorial Hospital–The Woodlands v. McCown*, 927 S.W.2d 1, 3 (Tex.1996).

## V. ANALYSIS OF THE EVIDENCE.

We now consider the evidence presented at trial. As noted earlier, malice has two prongs—one objective, one subjective—both of which must be met. First, we will look for evidence to meet the objective prong of malice and then for evidence to meet the subjective prong.

Under the objective prong, the Romeros rely on three specific professional issues they claim show Baker posed an extreme risk of harm: drug abuse, professional incompetence, and Dr. Kerr's opinion of Baker. As our discussion below will show, we conclude that an extreme risk of harm is shown only for the drug abuse.

We will then turn to the subjective prong. However, having found no evidence to show an extreme risk of harm based on professional incompetence or Dr. Kerr's opinion of Baker, we will review the only issue surviving the objective prong: Baker's drug abuse. We will then look at that issue to decide if the Hospital had subjective awareness of it. Concluding that the Hospital did have subjective awareness of the drug abuse, we will then turn to the final issue: whether the Hospital was consciously indifferent to the risk of harm Baker's drug abuse posed.

### A. THE OBJECTIVE COMPONENT: EXTREME RISK OF HARM.

To prove the objective component of malice, the Romeros were required to show that, considering the probability and magnitude of the potential harm to others, the Hospital's conduct involved an extreme risk of harm. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7)(B)(i); *Sanchez*, 997 S.W.2d at 595; *Emmons*, 50 S.W.3d at 127.

We first examine whether the Hospital's conduct in extending and maintaining Dr. Baker's staff privileges at the Hospital posed an extreme risk of serious injury to patients. The Hospital makes a five-part challenge to the objective component of malice, claiming that there is no evidence of the following: (1) whether an official complaint about Baker was lodged, (2) what conduct or deficiency that complaint raised, (3) what objective facts were presented to the committee or the board, (4) Baker's ability to perform surgery when the credentialing decisions were made, and (5) what action the Hospital took in response to what it learned. As noted earlier, there is no specific evidence of these items because the Hospital chose to stand on its privilege. However, we do not

---

7. Some exceptions exist, but they are not relevant here.

8. The peer review is not only of doctors but also of other health-care providers.

agree that all of these questions must be answered affirmatively before the Romeros can prove the objective prong. As we discuss below, enough circumstantial evidence exists to show that Baker had a drug abuse problem and that a doctor abusing drugs poses an extreme risk to patients.

### 1. Drug Abuse.

#### a. *Legal Sufficiency.*

■ The Romero's credentialing expert, Dr. Eichhorn, testified that when the chief of staff knows that a doctor poses a risk to patient safety, and has been told that the doctor allegedly abuses drugs, the chief of staff and hospital put the hospital's patients at extreme risk if the doctor is put on the staff. Even the Hospital's expert conceded that a doctor who operates while on drugs can pose a serious risk to patients.

The Hospital's own application process and Code of Conduct further demonstrate the importance of a drug-free environment. The Hospital requires every physician applying for privileges to disclose whether he or she is "using illegal drugs or illegally abusing legal drugs," and investigates the applicant's references to confirm the truthfulness of the answer. The Hospital's Code of Conduct warns that those who report to work under the influence of any illegal drug or alcohol in their system face immediate termination.

A Hospital employee in charge of working with the credentialing committee and with quality control for the Hospital testified that if the chief of staff hears that a doctor being considered for privileges abuses drugs, he has an obligation to inform the credentialing committee. Furthermore, an expert for the Hospital agreed that, with this type of information available to it, a credentialing committee would investigate.

Viewing the evidence in the light most favorable to the verdict, the evidence showed that the Hospital knew that a doctor who abuses drugs poses an extreme risk to patients.

#### b. *Factual Sufficiency.*

■ The Hospital does not dispute that Baker was addicted to prescription drugs. There was evidence that Baker took Vicodin, a prescription narcotic, "by the handfuls." The Hospital's credentialing expert, Dr. Binder, confirmed that even when taken at recommended dosages, Vicodin can cause adverse reactions of the central nervous system, including drowsiness, mood changes, and impairment of mental and physical performance. Although Dr. Binder acknowledged that Baker took prescription narcotics by the handfuls, he attempted to downplay the significance of the possible adverse reactions to the drugs as a "warning issue" that applies to almost all drugs. He also opined that drug abuse does not necessarily imply impairment, noting that "[a]lcoholics do their job every day." However, Dr. Binder conceded that it was never acceptable for a physician impaired by drugs to operate on a patient.

Baker's former wife testified that Baker exhibited mood swings and erratic behavior when he abused drugs. She testified that, a few days before Romero's surgery, Baker assaulted her and threatened to commit suicide. She stated that at the time of the assault, Baker exhibited the same behavior she observed on other occasions when he abused drugs, only more extreme than she had previously seen. Although there is no evidence that the Hospital was aware of this incident, it provided the jury with a graphic illustration of the type of adverse reaction that can occur when a physician abuses drugs as Baker

did, and the jury was free to consider it when weighing Dr. Binder's testimony.

We find that the Romeros presented factually sufficient evidence from which a jury could find that, from the viewpoint of the Hospital, its conduct in granting or maintaining surgical privileges for a doctor who abuses drugs involved an extreme degree of risk.

### 2. Professional Incompetence.

In addition to the evidence relating to drug addiction, the Romeros urged that Baker posed an extreme risk as a result of his professional incompetence. In support of this argument, the Romeros relied on malpractice lawsuits against Baker, including two wrong-limb surgeries, and Dr. Kerr's opinion of Baker. We will review the malpractice suits first and then consider Dr. Kerr's opinion.

### a. *Malpractice Suits and Wrong–Limb Surgeries.*

### (1) Legal sufficiency.

██ The Romeros do not claim that only one or two malpractice suits are sufficient to prove that a doctor poses an extreme risk to patients. They allege here that the sheer number of claims, including the type of claims, prove that Baker posed an extreme risk to patients. Below we review the evidence they relied upon.

In an attempt to show that Baker posed an extreme risk based on malpractice suits

and "botched" surgeries, the Romeros introduced evidence that, in the course of the credentialing process, the Hospital would have learned of a number of malpractice complaints that had been filed against Baker. When Baker applied for privileges with the Hospital, he was required to disclose any malpractice complaints against him. The Romeros submitted into evidence a number of malpractice lawsuits that had been filed against Baker. According to the Hospital's own credentialing expert, the peer review committee would have researched Baker's history regarding malpractice actions; this would have included reviewing the National Practitioner Data Bank, a federal data bank that records malpractice settlements by doctors.[9] The Romeros argued that the database would have contained the malpractice actions against Baker that resulted in settlements, including one lawsuit in which Baker operated on the wrong leg of a patient and another in which he left a sponge in a patient. The last of these lawsuits was in 1993.

In mid-May of 1998, two months before Romero's surgery, nearby Cleveland Regional Medical Center suspended Baker's operating privileges. Baker admitted that one of the reasons for the suspension was that he operated on the wrong leg of a patient, although Cleveland Regional did not give this as a reason for suspending Baker.[10] Dr. Rosen, who was Chief of

9. Under federal law, each entity, including an insurance company, that makes a payment under an insurance policy, self-insurance, or otherwise, for the benefit of a physician in settlement of, or in satisfaction in whole or in part of, a claim or judgment against a physician for medical malpractice, must report detailed information on the payment to the National Practitioner Data Bank. 45 C.F.R. § 60.7 (2001). Hospitals must request information from the National Practitioner Data Bank at the time a physician applies for a position on its medical staff or for clinical

privileges at the hospital, and every two years thereafter for any physician on its medical staff or who has clinical privileges. *Id.* § 60.10(a). A hospital that fails to request the information as required is presumed to have knowledge of any information reported to the Data Bank concerning the physician. *Id.* § 60.10(b).

10. By letter dated September 7, 1999, Cleveland Regional informed Baker of its final decision to permanently suspend his privileges because of violations that included "numer-

Staff at Cleveland Regional and on the Hospital's surgery committee, admitted that he knew about this suspension. However, he also testified that when doctors from Cleveland Regional were reviewed at the Hospital, he did not participate in those discussions because of peer review confidentiality. Dr. Rosen further testified that Baker obtained a restraining order to prevent anyone at Cleveland Regional from discussing or mentioning Baker's suspension. That order did not expire until July 16, 1998, one day after Romero's surgery.

Baker testified that he was suspended from the Hospital pending an investigation after the Romero surgery, but there was also evidence that he performed at least two surgeries there in September. He did not reapply for privileges at the Hospital.

The Romeros argue that Baker's malpractice claims alone would support the jury's finding of extreme risk—independent of his drug use. In support of this argument, they point us to the testimony of their expert, Dr. Eichhorn, who testified that Baker posed an extreme risk to patients. However, when stating that Baker posed an extreme risk to patients, Dr. Eichhorn did not rely solely on the malpractice evidence. Rather, his opinion was based upon all of the Romeros' evidence, including evidence of the alleged drug abuse and the second wrong-limb surgery (the Chavez surgery) at Cleveland Regional in 1998.

The Hospital's expert agreed that repeated instances of operating on the wrong limb was not an acceptable outcome. However, for two reasons, we cannot conclude that the Hospital knew of the Chavez surgery before the Romero surgery. First, the record contains no evidence that the Hospital knew of the Chavez surgery,

or of Baker's suspension, until after the Romero surgery. The only time the Hospital could have found out about them was during a period between Baker's suspension at Cleveland Regional and the date the restraining order went into effect. But, other than Dr. Rosen's affirmative statement that he did not reveal any information to the Hospital, this record contains absolutely no evidence to show that the Hospital heard about the suspension or that it was likely that the Hospital would hear about it. To say that the Hospital did hear about it would require an assumption; to say that it did not hear about it would also require an assumption. And, since there is no evidence to show that either assumption would be reasonable, we are not authorized to make either assumption. Second, the lawsuit resulting from the Chavez surgery would not have appeared in the National Practitioner Data Bank until it settled. The lawsuit was not even filed until after the Romero surgery.

The Romeros presented no evidence or expert opinion that, in the absence of knowledge of the Chavez surgery, or in the absence of drug abuse, Baker would have posed an extreme degree of risk to patients as a result of the prior malpractice actions.

In short, the malpractice suits filed between 1988 and 1993 are no evidence that Baker posed an extreme risk to patients due to professional incompetence. Consequently, the evidence is legally insufficient to demonstrate that Baker's malpractice suits revealed a potential for extreme degree of risk. *See Agbor*, 952 S.W.2d at 509 (upholding summary judgment against plaintiffs who alleged hospital was grossly negligent in renewing staff privileges of doctor who had been the subject of many

---

ous delinquent medical charts, failure to make daily rounds for all patients as required

..., and failure to enter timely progress notes for all patients."

medical malpractice cases, was not a Texas resident, and was not properly insured for medical malpractice). Having found legally insufficient evidence on this item, we need not perform a factual sufficiency review.

### b. *Dr. Kerr's Opinion of Baker.*

#### (1) Legal sufficiency.

 At first glance, perhaps the most compelling evidence regarding professional incompetence was testimony by Dr. Kerr, the Hospital's Chief of Staff in 1996. He admitted that he believed Baker posed a risk to the safety of patients, and that he had consistently held this opinion since 1990.

 For Dr. Kerr's opinion to meet the statutory requirement, his testimony must show that Baker's level of competency was so bad that it involved an extreme degree of risk. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B)(i). This threshold is significantly higher than the objective "reasonable person" test for negligence. *See Moriel,* 879 S.W.2d at 22. "Extreme risk" is a function of magnitude of injury and probability of injury. *Id.* The "extreme risk" (objective) prong of malice is not satisfied by a remote possibility of injury or even a high probability of minor harm; it is satisfied only by "the likelihood of serious injury" to the plaintiff. *See id.* We agree that Dr. Kerr's testimony was sufficient to show that Baker posed a risk to patients; the question is whether the testimony showed by clear and convincing evidence that Baker posed an *extreme* risk to patients.

Unquestionably, Dr. Kerr intensely disliked Baker and did not trust him. This was in part because of a business dispute between them in 1990 and in part because of (1) knowledge Dr. Kerr gained as a result of an investigation he did into Baker's background, and (2) from his own experiences with Baker. As for the business dispute, Dr. Kerr testified that Baker was sharing office space with him, had agreed to split the costs of equipment and rent, and, only a month after the arrangement began, stopped paying his share.

But the distrust also seemed to stem in part from Dr. Kerr's own encounters with Baker and from information he received from a medical group in South Carolina that fired Baker. A lawyer for the group told Dr. Kerr that Baker had forged signatures on his application for a license to practice in Mississippi; because of this, the license was initially denied, but later granted.[11] He also told Dr. Kerr that the South Carolina group fired Baker because he had "patient care issues" and was not "working in a manner that they felt was good." According to the lawyer, the group had determined a course of treatment for a long-time patient of the group; Baker intervened and undertook a totally different, more aggressive approach. The approach, which involved surgery, resulted in problems for the patient. Baker apparently tried to "remove the patient from the scene" by moving the patient to a smaller hospital.

Dr. Kerr himself experienced attempts by Baker to take over his patients who came to the emergency room. Apparently, the patients were told that Dr. Kerr was out of town and that Baker would be seeing them. Dr. Kerr said that he had made no such arrangement with Baker.

Based on these things, Dr. Kerr formed an opinion that Baker "certainly wasn't

11. There was evidence that, during the three years Baker was licensed in Mississippi, no disciplinary orders were entered against him. There was also evidence that he had a license in good standing in South Carolina.

qualified to be practicing with [him]," and that he did not want Baker to see his patients or have anything to do with his patients. He agreed that these opinions were "at least in part, from the concern of safety." We do not think that this evidence is legally sufficient to demonstrate that Baker posed an extreme degree of risk.

### (2) Factual sufficiency.

 Even if we were wrong in our conclusion that the evidence was legally insufficient, a factual sufficiency review clearly would reveal insufficient evidence. Under a factual sufficiency review, we would look at the following additional evidence.

Apparently, Dr. Kerr thought Baker was a poor doctor and he did not want Baker to take care of his patients. He also appears not to have trusted Baker on a personal or professional level. However, he never reported Baker to the State Board of Medical Examiners for any misconduct. (Baker was not referred to the Board until 1996, when his former partner turned him in for suspected drug abuse.) He never once mentioned the word "injury" in his testimony. He also admitted that his opinion of Baker posing a risk to patients was not based on specific instances of patient treatment at Kingwood; it was based on the information he obtained in his investigation of Baker in 1990. When asked what he had directly observed about Baker's practice, he referred only to the problem he had with Baker taking some of his emergency-room patients without his permission. He did not refer to any care issues at the Hospital.

Viewing this evidence in its entirety, we do not believe that a reasonable jury could form a firm belief or conviction that Baker posed an extreme risk of serious injury to

patients because of professional incompetence. *See In re C.H.*, 89 S.W.3d at 21.

SUMMARY OF OBJECTIVE PRONG DISCUSSION

In summary, the Romeros satisfied the objective component of malice, but only with regard to Baker's drug abuse.

**B. THE SUBJECTIVE COMPONENT: ACTUAL SUBJECTIVE AWARENESS AND CONSCIOUS INDIFFERENCE.**

We next examine the second component of malice—the subjective component. It has two elements: (1) whether the Hospital had actual, subjective awareness that Baker posed an extreme risk to patients, and (2) with conscious indifference to the rights, safety, or welfare of its patients, still granted him credentials to practice at the Hospital. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7)(B)(ii); *Sanchez*, 997 S.W.2d at 596; *Moriel*, 879 S.W.2d at 22. As we explain below, we find legally and factually sufficient evidence to support a finding that the Hospital was subjectively aware of the extreme risk. However, because we do not know what actions the Hospital took in response to its knowledge, the record fails to support a finding that the Hospital was consciously indifferent.

### 1. Subjective Awareness.

#### a. *The Parties' Arguments.*

The Hospital argues that the jury was required to find that the subjective awareness and the decision to credential had to coexist in the collective minds of all voting members of the applicable committee. It argues that no reasonable jury could make this finding in the absence of the following evidence: (1) whether a complaint was ever made about Dr. Baker; (2) what evidence was reviewed by the Hospital; (3) the quantity and credibility of that evidence; (4) how each voting member viewed that evidence; (5) the content and

extent of discussion about the evidence; (6) the nature and believability of any defenses or explanations offered by Baker; and (7) the subjective basis for each doctor's vote. Clearly, most of these issues can be proved only by direct evidence, an argument we reject. As we have stated, the knowledge, actions, or proceedings of the credentialing committee may be proved by circumstantial evidence. The amount of detail the Hospital claims we need is not required to prove subjective awareness.

To prove subjective awareness, the Romeros point to the same evidence they relied on for the objective component: the drug abuse and professional incompetence. Because we have already held that the Romeros did not meet the first component of malice, as to whether Baker posed an extreme risk to patients because of professional incompetence, we need not address whether they met the second component. Instead, we will consider what proof showed that the Hospital was subjectively aware of Baker's drug abuse.

### b. *Subjective Awareness of Drug Abuse.*

The Romeros argue that the Hospital was subjectively aware of the extreme risk Baker posed to patients as a result of his drug abuse. They claim the Hospital gained this knowledge from the credentialing process, and that this knowledge would have included Dr. Kerr's knowledge of suspected drug abuse.

### (1) Legal sufficiency of the evidence.

■ We agree that the evidence listed below shows that the Hospital had actual, subjective awareness that Baker was abusing drugs. This knowledge stems from Dr. Kerr, not because Dr. Kerr was a vice-principal of the Hospital—a question we do not reach—but, because, being chief of staff, he would have told the Hospital about the alleged abuse.

Barbara Pickett, the Director of Quality and Resource Management at the Hospital, testified that if the chief of staff (Dr. Kerr) knew that a particular physician posed a risk to patients, or had heard allegations of drug abuse by a physician's partner, the chief of staff had an obligation to tell the credentialing committee. Additionally, Dr. Binder, the Hospital's credentialing expert, testified that if there are allegations of drug abuse against a physician, a hospital must investigate the allegations. Dr. Binder assumed Dr. Kerr performed his duty to report and investigate allegations of drug abuse against Baker, and there is no evidence Dr. Kerr did not do so. Dr. Binder testified that an investigation would include speaking to Dr. Parkinson, the physician who made the allegation, and speaking to Baker's office manager, Janet Pickett, who confronted Baker about his drug use and accompanied him to drug counseling. Dr. Binder also testified that it was reasonable to assume that, if the Hospital followed its procedures, it would have obtained Baker's counseling records and confirmed his drug abuse. There was no evidence that the Hospital failed to follow its procedures.

Moreover, Baker's former wife testified, without objection, that the Hospital was aware of Baker's drug abuse. She also testified that the Hospital postponed its 1996 credentialing decision until the Board of Medical Examiners completed its review of the allegations of drug use and excessive lawsuits against Baker. Viewed in the light most favorable to the Romeros, we find legally sufficient evidence exists that the Hospital was subjectively aware of Baker's drug abuse.

**(2) Factual sufficiency of the evidence.**

 The Hospital argues that it is undisputed that when the 1996 credentialing occurred, two years before Romero's surgery, the State Board of Medical Examiners had considered allegations of drug abuse and numerous malpractice claims against Baker, but closed its investigation with no recommended action. Consequently, it claims this evidence, coupled with the lack of direct evidence of the credentialing committee's knowledge, actions, and proceedings relating to Baker foreclose the Romeros' claim. However, we have already rejected the Hospital's contention that such direct evidence is required. And, the evidence that the Board of Medical Examiners closed its investigation into Dr. Baker's alleged drug abuse and excessive malpractice lawsuits without further action is not dispositive. The Board's decision not to act does not excuse the Hospital from carrying out the review mandated by its own procedures. Indeed, Dr. Binder, the Hospital's credentialing expert, testified that the Hospital's obligation to investigate Baker's background was independent from the Medical Board's. Therefore, based on the evidence presented, we find that a reasonable jury could form a firm belief or conviction that the Hospital had actual, subjective awareness that Baker posed an extreme risk to patients.

In summary, the Romeros demonstrated by legally and factually sufficient evidence that the Hospital had actual, subjective awareness that Baker's drug abuse posed an extreme risk to patients.

**c. *Conscious Indifference.***

 We now turn to the final hurdle for the Romeros in proving the subjective prong: conscious indifference. The Romeros contend that the Hospital acted with conscious indifference to the rights of its patients by failing to deny or revoke Baker's privileges despite its actual, subjective awareness of the risk he posed because of his drug abuse. They claim three items of evidence show conscious indifference: first, the Hospital's decision to credential Baker and not suspend him before the Romero surgery even though it knew about the drug abuse; second, the Hospital's decision to allow Baker to operate after the surgery; and third, Dr. Eichhorn's testimony.

**(1) Drug abuse.**

As we have discussed, the Romeros showed that the Hospital had actual, subjective awareness that Baker's drug abuse posed an extreme risk to patients. The crux of their argument on conscious indifference appears to be that the Hospital was obligated to (1) automatically deny Baker's active staff credentials in 1996 or (2) suspend or terminate those credentials at some point thereafter as soon as it became aware of Baker's drug use and the malpractice actions against him. However, the evidence in the record—including that of the Romero's credentialing expert, Dr. Eichhorn—does not support this theory; it contradicts it.

When asked what the Hospital should have done if it suspects a physician of drug abuse, Dr. Eichhorn testified that a hospital committee should take several steps. First, the physician should be confronted under controlled conditions and subjected to drug testing. Next, the hospital should conduct an investigation of other institutions at which the physician has privileges to request their peer review information. And, on cross-examination, Dr. Eichhorn agreed that a number of other options exist when a hospital learns of alleged substance abuse; these options include monitoring, education, restrictions, counseling, and termination. However, Dr.

Eichhorn did not testify, nor did he suggest, that when the Hospital discovered Baker's substance abuse, it should have refused Baker active staff privileges in 1996 or withdrawn them at some point later.[12]

Because the Hospital invoked its confidentiality privilege, we do not know what the Hospital did in response to the information it had. We do not know if it took any steps such as requiring Baker to submit urine samples, or monitoring Baker, or if it did nothing. But one thing we do know: we cannot infer anything from this lack of information. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (holding meager circumstantial evidence, which could give rise to any number of inferences, is legal equivalent of no evidence).

In short, viewing the evidence in a light most favorable to the verdict, we find no evidence that the Hospital acted with conscious indifference in not suspending Baker at some point before the Romero surgery.

### (2) **Allowing Baker to operate after the Romero surgery.**

We next address the evidence that Baker was permitted to operate on other patients after he "botched" the Romero surgery. Baker's privileges at the Hospital were up for renewal in August of 1998, but he, along with the other physicians at the Hospital, was given a temporary extension due to an internal delay in the reappointment process. Thereafter, Baker operated at least twice in September of 1998. He did not reapply for privileges. However, the record also contains evidence that Baker was suspended from the Hospital pending an investigation because of the Romero surgery. Baker himself stated this in a videotaped deposition shown at trial.

This evidence, that the Hospital allowed Baker to operate, does not constitute clear and convincing evidence that the Hospital acted with conscious indifference in granting Baker privileges in 1996 or in failing to withdraw or suspend them at some point *before* the Romero surgery.

### (3) **Dr. Eichhorn's testimony.**

Finally, the Romeros contend that the testimony of their credentialing expert, Dr. Eichhorn, is some evidence to support conscious indifference. They point to two points of his testimony: Dr. Eichhorn's opinion that the Hospital had actual, subjective awareness of the extreme risk posed by Dr. Baker,[13] and his

---

12. Dr. Eichhorn did testify that Baker should have been suspended from the Hospital prior to the Romero surgery, but his testimony is vague as to when and why:

> Q. (By Mr. Mithoff) Was Dr. Baker still on the staff at the time of the Romero surgery?
> A. Yes, definitely. Obviously. He operated that day.
> Q. He had been suspended from Cleveland a couple of months before?
> A. Yes, he had.
> Q. Is that what [the Hospital] should have done in this case?
> A. Yes, definitely.
> Q. And if that had been done, this tragedy could have been avoided?
> A. He would not have been there that day doing this.

Dr. Eichhorn offered no basis for the opinion that Baker should have been suspended at the Hospital other than the evidence that he was suspended from Cleveland Regional. However, as we have discussed, there is no evidence that the Hospital knew of Baker's suspension at Cleveland Regional or the reasons for it, and we can make no assumptions from the lack of evidence.

13. The Hospital objected to this evidence as legally insufficient because (1) it was based on insufficient data and lacked a necessary rationale, and (2) Dr. Eichhorn was not qualified to give such an opinion. In response, the

opinion that Baker's privilege should have been suspended before the Romero surgery. Unfortunately for the Romeros, neither opinion supports a finding of conscious indifference. First, Dr. Eichhorn testified only that the Hospital had subjective awareness of the risk; we have already agreed that the evidence supports this conclusion. However, as we have explained, subjective awareness of a risk—without more—is not enough. And, Eichhorn was not permitted to give an opinion whether the Hospital acted with conscious indifference.[14] Second, Eichhorn's testimony that the Hospital should have suspended Baker before the Romero surgery was based not only on the drug abuse, but also on the Chavez surgery at Cleveland. No evidence shows that the Hospital knew about the Chavez surgery until after Romero's surgery. Therefore, Dr. Eichhorn's testimony does not support a conclusion that the Hospital acted with conscious indifference.

### SUMMARY OF DISCUSSION OF MALICIOUS CREDENTIALING CLAIM

In sum, the Romeros met the objective prong of the malicious credentialing claim as to Baker's drug abuse, and also showed that the Hospital was subjectively aware of the extreme risk Baker's drug abuse posed to patients. However, the Romeros failed to demonstrate that the Hospital acted with conscious indifference. We therefore sustain the Hospital's complaint that legally insufficient evidence existed to support the malicious credentialing claim.

The Romeros argue that if malice was not proved here, it can never be proved. They may very well have a point. Texas

Supreme Court Chief Justice Tom Phillips commented in *Agbor* that under our current law, the heightened immunity provided by the Texas Medical Practice Act makes proving a malicious credentialing claim "virtually impossible," "no matter how meritorious" the claim. *Agbor*, 952 S.W.2d at 512 (Phillips, C.J., dissenting).

> I find it difficult to conceive that a hospital would credential its doctors with either the intent to harm patients or with such reckless disregard for their welfare as to establish malice. Even if such a case were to exist, however, a plaintiff would not be able to prove it because ... the ... [Act] prevents discovery of the peer review committee's records.

*Id.*

This case certainly does nothing to contradict Chief Justice Phillips's point, because, as discussed, many troubling facts were known about Baker. Yet, without proof of what actions the Hospital did or did not take in response to Baker's problems, the Romeros could not prove conscious indifference.

## VI. ALLEGED CHARGE ERROR.

■ Having found that there was legally insufficient evidence to support the submission of the malicious credentialing claim, we turn to the Hospital's complaints regarding the charge. We will first consider the standard of review, then look at the questions asked of the jury, review the parties' arguments on this issue—including a waiver argument the Romeros raise—and then finally apply the standard of review to the charge itself.

---

Romeros contend that the Hospital's objections go to admissibility, not sufficiency, and it waived those objections by failing to make them to the trial court. Our resolution of the malice issue does not require that we address this contention.

**14.** The Romeros did not challenge the trial court's ruling upholding the Hospital's objection to this testimony.

## A. The Standard of Review.

The standard of review controls our answer to these arguments. For alleged charge error to be reversible error, the trial court must have abused its discretion. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The court abuses its discretion in connection with the charge—and commits reversible error—if the error probably caused the rendition of an improper judgment.[15] Tex.R.App. P. 44.1(a)(1). In determining whether error is reversible, we must consider the record as a whole, including the parties' pleadings, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986).

## B. The Parties' Arguments.

The Hospital contends that the error in submitting the malicious credentialing claim tainted the entire charge. It notes that the court submitted a single damages question and a single question on the apportionment of liability (predicated on a finding of either ordinary negligence and/or the improperly-submitted malicious credentialing claim). It claims this error cannot be isolated and rendered harmless because we cannot tell if the jury apportioned fault and awarded damages on the basis of its malice finding. The Hospital urges us to remand for a new trial under the Texas Supreme Court's pronouncements in *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex.2000); *see also Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002). In *Casteel*, the Court held that when a trial court submits a single broad-form liability question incorporating multiple theories of liability—some of which are invalid—the court commits reversible er-

ror and a new trial is required if the appellate court cannot determine if the jury based its verdict on an invalid theory. *Casteel*, 22 S.W.3d at 390.

The Romeros respond with three arguments. First, they claim the Hospital waived any error on this issue because it objected to both a single submission of the apportionment question and the submission of two apportionment questions, and did not suggest an alternative. Second, the Romeros argue that *Casteel* applies only when invalid claims are mixed with valid claims. According to the Romeros, adopting the Hospital's position would extend *Casteel* to sufficiency complaints, making broad-form submission obsolete, and resulting in needless relitigation of valid claims. Third, they argue that the verdict and, at the very least, the actual damages, should be affirmed because the jury found the Hospital liable for ordinary negligence, and that finding has not been challenged. We will take the time here to briefly address the waiver argument. The remainder of the arguments—for both parties—we will address under section D, when we apply the standard of review to the facts of this case.

Regarding the Romeros' waiver argument, the record is clear that the Hospital made the trial court aware of its complaint. During the charge conference, the Hospital specifically referenced *Casteel* in its objection to a single apportionment question, and further objected to the submission of two apportionment questions on the grounds that it would be an improper comment on the weight of the evidence. The trial court understood the objections, and made her ruling to submit a single apportionment question. As the Texas Supreme Court has repeatedly admonished, "[t]here

---

**15.** Reversible error is also committed if the error prevented the appellant from properly presenting its case to the court of appeals. Tex.R.App. P. 44.1(a)(2).

should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). Therefore, we hold that the Hospital did not waive its objection.

## C. THE JURY ISSUES.

The issues submitted to the jury are central to our review. The first four issues exemplify the problems the Hospital raises. Questions 1 and 2 are listed because they show what the jury was asked regarding negligence and malicious credentialing. Questions 3 and 4 are set out to show both the questions asked of the jury and the prefatory language used to instruct the jury on whether to answer them.

### Question No. 1

Did the negligence, if any, of those named below proximately cause the occurrence or injury in question?

In answering this question, do not consider the conduct of Columbia Kingwood in the granting or the retention of Dr. Merrimon Baker's active surgical credentials. Consider only the conduct of Suwanna Rubio, RN, other hospital nurses and the hospital blood laboratory personnel.

Answer "Yes" or "No" for each of the following:

| | | |
|---|---|---|
| a. | Columbia Kingwood | "yes" |
| b. | Linda Fincher CRNA | "no" |
| c. | Dr. Merrimon Baker | "yes" |
| d. | Dr. William Huie | "yes" |

If you have answered "yes" as to Dr. Merrimon Baker in Question No. 1, then answer the following question. Otherwise, do not answer the following question.

### Question No. 2

Do you find by clear and convincing evidence that, in the granting or the retention of Dr. Merrimon Baker's active surgical credentials, that Columbia Kingwood acted with malice and that such conduct was a proximate cause of the occurrence or injury in question?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means an act or omission by Columbia Kingwood:

(i) which, when viewed objectively from the standpoint of Columbia Kingwood at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which Columbia Kingwood had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a hospital using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Answer "Yes" or "No."

Answer: "yes"

If you have answered "yes" as to more than one person or entity in Question No. 1 or 2 then answer the following question. Otherwise, do not answer the following question.

### Question No. 3

What percentage of the conduct that caused the occurrence or injury do you find to be attributable to each of those found by you, in your answer to Question No. 1 and/or 2 to have caused the occurrence or injury?

The percentages you find must total 100 percent. The percentage must be expressed in whole numbers the percentage attributable to those named below is not necessarily measured by the number of acts or omissions found.

a. Columbia Kingwood "40" %

b. Linda Fincher CRNA %

c. Dr. Merrimon Baker "40" %

d. Dr. William Huie "20" %

 100%

If you have answered Question No. 1 or 2 "Yes," as to any person or entity, then answer the following question. Otherwise, do not answer the following question.

### Question No. 4

What sum of money, if paid now in cash, would fairly and reasonably compensate Ricardo Romero for his damages, if any, resulting from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

a. Physical pain and mental anguish sustained in the past.

Answer: $250,000.00

b. Physical pain and mental anguish, that in reasonable probability, will be sustained in the future.

Answer: $5,000,000.00

c. Loss of earning capacity sustained in the past.

Answer: $85,000.00

d. Loss of earning capacity that, in reasonable probability, will be sustained in the future.

Answer: $1,700,000.00

e. Physical and mental impairment sustained in the past.

Answer: $250,000.00

f. Physical and mental impairment that, in reasonable probability, will be sustained in the future.

Answer: $5,000,000.00

g. Medical, hospital and rehabilitation care sustained in the past.

Answer: $665,000.00

h. Reasonable expenses of necessary medical, hospital and rehabilitation care that, in reasonable probability, will be sustained in the future.

Answer: $7,000,000.00

Questions 5 through 8, which asked the jury to determine actual damages to be awarded, if any, to Dolores, Joanne, and Jennifer Romero, contained the same predicate as question 4. Questions 9 and 10 asked the jury what amount of exemplary damages it would assess against the Hospital and award to Mr. and Mrs. Romero.

## D. APPLICATION OF THE STANDARD OF REVIEW TO THE CHARGE.

The parties have both addressed the recent Supreme Court decision—*Casteel*—and argued that it does or does not apply here. We agree with the Romeros that *Casteel* does not apply, but we reach that conclusion for a different reason than they do. As we explain below, we conclude the traditional harm analysis applies to this case, so that we need not rely on *Casteel.* Below, we will first explain why *Casteel* does not apply and then we will apply the traditional harm analysis to this case, finding that the error permeated both the liability answer and the actual damages.

### 1. Casteel Does Not Apply.

In *Casteel,* the Court held that the error of submitting a single broad-form liability question incorporating multiple liability theories, some of which were invalid, is harmful when it cannot be determined whether the jury based its verdict on an improperly submitted invalid theory. 22 S.W.3d at 388.

As the *Casteel* court explained:

It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law. Yet, when a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error. The best the court can do is determine that some evidence *could* have supported the jury's conclusion on a legally valid theory. To hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant *should* be held liable on proper, legal grounds.

*Id.* We do not think *Casteel* controls this case. Instead, the traditional standard of review can be applied because, unlike *Casteel,* we do not have to guess if the erroneously submitted question impacted the liability or damages answers. We know with almost certainty that it did impact the answers. We explain below.

### 2. Application of the Traditional Harm Analysis to the Charge.

In applying the harm analysis to this charge, three jury questions control the outcome of the appeal: one was properly submitted, one was improperly submitted, and the third was conditioned on the other two. This is where the problems lie.

Everyone agrees that the negligence claim (question 1) was properly submitted. But, we have also determined that the malicious credentialing claim (question. 2) should not have been submitted. The question asking the jury to assess percentages of liability (question 3) was predicated on a finding of liability for negligence (question 1) or malicious credentialing (question 2) or both.

The jury found the Hospital liable for both negligence (question 1) and malicious credentialing (question 2). The jury also found the Hospital 40% liable (question 3) for Romero's injuries. We find it hard to believe that the 40% liability the jury attributed to the Hospital in question 3 was not based (1) partly on the liability it found for negligence (question 1), and (2) partly on the liability it found for malicious credentialing (question 2). In fact, we find it inconceivable that the jury would find liability based on the two different acts, but not attribute some responsibility to both acts. It may be that 39% of the responsibility was attributed to malicious credentialing and 1% to negligence, or that 39% was attributed to negligence and only 1% to malicious credentialing. Regardless, the error is present.

The actual damages also are permeated by this problem because the actual damages question—like liability—was predicated on the jury finding either negligence or malicious credentialing or both. The jury found both. Since the question was predicated on either or both acts, the jury was given the impression that it could base damages on either or both acts.

The record as a whole supports our conclusion that the jury must have based part of the actual damages on negligence and part on malicious credentialing. At trial, the Romeros focused on both the negligence and the malicious credentialing claims. During closing argument, the Romeros asked the jury to attribute 80% of the cause of injuries to the malicious credentialing claim and 20% to the negligence claim.[16]

### SUMMARY OF DISCUSSION OF CHARGE ERROR

In sum, the Hospital preserved the charge issues because it notified the Court of the problems with the charge. In re-

---

**16.** The Romeros' closing argument emphasizes that the Hospital should bear the brunt of the liability, not the individuals listed in question 1:

> The hospital will tell you Baker should be punished because he held the knife and he did hold the knife, but it was the hospital that let him hold it.
> He is an addict, but every addict has an enabler. And the hospital was his enabler.... I suggest to you that the overwhelming responsibility for what happened here lies with Columbia Kingwood.
> Now, the assessment is your own judgment, but I suggest to you that when you take into account all of what happened with respect to the delay in the blood and all of what happened with respect to their awareness of the actual risks when they allowed this man to come on to the staff and stay on to the staff, that the responsibility of the hospital clearly exceeds 80 percent of responsibility for this tragedy.

When specifically addressing the apportionment question, counsel further explained:

viewing the alleged error, we agree that the malicious credentialing claim should not have been submitted. This error probably caused the rendition of an improper judgment in two respects. First, the punitive damages are not supported by the evidence and must be reversed. Second, some—or all—of the percentage of liability the jury found was based on the improperly submitted malicious credentialing claim. As a result, all of the actual damages awarded are tainted with this error and must be reversed and a new trial held on negligence.

Because of our disposition of the first issue, we need not address the remainder of the Hospital's issues.

### CONCLUSION

The judgment of the trial court is reversed and rendered on the malicious credentialing claim, and reversed and remanded for a new trial on negligence and damages.

SEYMORE, J., concurring.

> I suggest that you simply ask yourself who was in the best position, who was in the best position to prevent what happened to protect Mr. Romero, to protect his family? Was it Dr. Baker, the addict? Was Dr. Baker in the best position to remove himself from the hospital staff? Was Dr. Baker in the best position to remove himself from operating on patients at that hospital? He couldn't even admit that he had a problem. He certainly couldn't quit.
> Were the anesthesiologists in the best position? They were caught in the middle. They had to depend upon Baker to control the bleeding, stop the bleeding, and they had to depend on the hospital to get them the blood.
> I suggest that the lion's share of the responsibility, the vast responsibility, 80 percent of the responsibility would be a reasonable percentage to impose upon this hospital.

CHARLES W. SEYMORE, Justice, concurring.

I concur with the analysis and holding in the majority opinion but write separately in order to admonish bench and bar regarding the penchant for broad-form submission of jury questions.

Justice Fowler correctly concluded that *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000), does not apply in this case. However, *Casteel* provides some additional guidance here—that is, as the supreme court noted, "Rule 277 is *not absolute;* rather it mandates broad-form submission *'whenever feasible.'"* *Id.* at 390 (quoting TEX.R. CIV. P. 277, emphasis added).

It has become commonplace in the arena of civil litigation to interpret Rule 277 as mandating broad-form submission. *See id.* at 389 (noting Casteel's argument that Rule 277 required a single broad-form question); *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) (interpreting Rule 277 as an unequivocal mandate for broad-form submission); William V. Dorsaneo, II, *Broad–Form Submission of Jury Questions and the Standard of Review*, 46 SMU L.REV. 601, 603 (1992) (discussing the changing trend from discretionary to mandatory broad-form submission). However, as Professor Dorsaneo notes, "a blind adherence to the broad-form submission may make it difficult to attain the goals that the broad-form submission was intended to achieve, namely to reduce appeals and retrials." Dorsaneo, *supra*, at 603.

The initial position of the supreme court was, "unless extraordinary circumstances" make submission infeasible, broad-form questions must be asked. *E.B.*, 802 S.W.2d at 649. "Whenever feasible" was defined as "in any and every instance in which it is capable of being accomplished." *Id.* Many litigants and trail courts have been operating under the impression that

the supreme court completely ignored Professor Dorsaneo's warning. However, the court took a more relaxed position in subsequent cases. *See, e.g., H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex.1992); *Westgate, Ltd. v. State*, 843 S.W.2d 448, 455 n. 6 (Tex.1992). In *H.E. Butt Grocery Co. v. Warner*, the court decided submitting a case in granulated-form, instead of the broad-form "mandated" by Rule 277, did not constitute reversible error "because the charge fairly submitted to the jury the disputed issues of fact and because the charge incorporated a correct legal standard for the jury to apply. . . ." *Warner*, 845 S.W.2d at 259. Further, in *Westgate, Ltd. v. State*, the court recognized that submitting alternative liability standards when the governing law is unsettled might also be a situation where broad-form is not feasible. *Westgate, Ltd.*, 843 S.W.2d at 455 n. 6. While this court's opinion was in final stage for issuance, the supreme court further clarified its position on broad-form submission. In *Harris County v. Smith*, 96 S.W.3d 230, 234–35 (Tex.2002), the court reiterated the necessity for a granulated charge when a party specifically objects to submission of valid and invalid elements of damage in a single question.

Appellees seek damages under two legal theories: (1) negligence and (2) malicious credentialing. Texas law pertaining to malicious credentialing of physicians is somewhat unsettled. The Texas Supreme Court first recognized the claim five years ago in *St. Luke's Episcopal Hospital v. Agbor*, 952 S.W.2d 503 (Tex.1997). The court iterated that negligent credentialing was not a well-recognized, common law cause of action and reserved deciding whether such a common law action existed. *Id.* at 508. More importantly, the court held the claim required proof of an essential element not required of a typical negligence claim—malice. *Id.* at 509.

The trial court properly submitted two liability questions, separating liability for negligence from liability for malicious credentialing. However, the trial court erred by submitting a single apportionment question. In jury question number three, the court asked the jury to allocate "percentage of the conduct" notwithstanding the fact that appellees were prosecuting claims under two distinct theories of liability. The record reflects that the trial court was fully cognizant of this problem and the court warned the parties regarding the potential for error in submitting one apportionment of liability question. However, counsel for appellee suggested that the supreme court favors "broad form" submission. The result: this case must now be sent back to the trial court for retrial and possibly a subsequent appeal, wasting valuable and limited judicial resources. A "granulated charge" would have directed the jury to separately allocate responsibility and award damages under each theory of liability supported by evidence presented during the trial. Such a charge would have fairly submitted to the jury the disputed issues of fact and incorporated the correct legal standards for the jury to apply, all the while making the questions easy for the jury to comprehend and answer. *See Warner*, 845 S.W.2d at 259; *E.B.*, 802 S.W.2d at 649. More importantly, this court would be able to determine whether there was sufficient evidence to support the verdict.

This case illustrates why bench and bar must be acutely aware of all the reasons why Rule 277 is not absolute. I would encourage trial courts to exercise their broad discretion in favor of granulated-form submission, especially in cases involving multiple theories of liability.