IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 
03-0497
════════════
 
Dolores 
Romero, et al., Petitioners
 
v.
 
KPH 
Consolidation, Inc. d/b/a
Columbia 
Kingwood Medical Center, Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Fourteenth District of Texas
════════════════════════════════════════════════════
 
 
Argued September 9, 2004
 
 
Justice Hecht delivered the opinion of 
the Court, in which Chief Justice 
Jefferson, Justice Owen, Justice O’Neill, Justice Wainwright, Justice 
Medina, and Justice Green 
joined.
 
Justice O’Neill filed a concurring 
opinion, in which Justice Medina 
joined.
 
Justice Brister and Justice Johnson did not participate in 
the decision.
 
 
This 
is an action against a hospital for negligently delaying a blood transfusion for 
the plaintiff while he was in surgery, and for malicious credentialing of the 
surgeon.  The trial court rendered 
judgment on a verdict for the plaintiff on both claims.  As the case comes to us, it raises two 
principal issues, each requiring a bit of explanation at the outset.
The 
first issue is whether there is any clear and convincing evidence that the 
hospital acted with malice in credentialing the surgeon C 
that is, in initially granting him privileges to practice in the hospital, and 
then allowing him to retain them.  
In Texas, by statute, a hospital is not liable for improperly 
credentialing a physician through its peer review process unless the hospital 
acts with malice,[1] 
defined (for the time period involved in this case) as actual awareness of, yet 
conscious indifference to, an extreme risk.[2]  Proof of malice is made more difficult 
in this setting because peer review communications and proceedings are generally 
confidential and privileged from disclosure.[3]  Since the Rules of Evidence prohibit 
drawing any inference from a claim of privilege in a civil case,[4] 
a plaintiff must prove that a hospital acted maliciously without access to 
evidence of what happened, or did not happen, in the credentialing process.  The jury in this case was instructed, at 
the plaintiffs’ request, that they could find malice only from clear and 
convincing evidence, and they did so.  
But the court of appeals determined that there was no evidence of 
malice.[5]  We conclude that there was no clear and 
convincing evidence of malice.
The 
question then becomes whether judgment can rest on the jury’s negligence 
finding.  The answer turns on the 
second issue: whether it was reversible error to allow the jury, in apportioning 
responsibility for the plaintiff’s injuries among the hospital, two physicians, 
and a nurse, to consider the hospital’s alleged malicious credentialing, of 
which we conclude there was no evidence, along with the hospital’s negligent 
delivery of blood to the operating room, for which the hospital does not 
challenge liability here.  The jury 
could logically have thought the hospital responsible to a lesser degree had 
they been permitted to consider only the hospital’s negligence.  The apportionment question was submitted 
to the jury in broad form, as required by Rule 277 of the Texas Rules of Civil 
Procedure “whenever feasible”.[6]  But broad-form submission cannot be used 
to put before the jury issues that have no basis in the law or the evidence.[7]  The significant benefits of broad-form 
submission neither necessitate nor justify misleading the jury with legally or 
factually invalid claims.  We agree 
with the court of appeals that the submission of the apportionment question was 
error, that it probably caused the rendition of an improper judgment, and that 
complaint of the error was preserved for appeal.[8]
The 
court of appeals reversed the judgment of the trial court and remanded the case 
for a new trial on the negligence claim against the hospital.  We affirm.
I
Dr. 
Merrimon Baker applied to Columbia Kingwood Medical 
Center in February 1993 for privileges to practice there as an orthopedic 
surgeon.  Columbia (the business 
name used by respondent KPH Consolidation, Inc.) is an acute care facility in 
Kingwood, on the northeast side of Houston, with 155 beds and 360 doctors on 
staff.  Baker had been practicing 
nearby, at what is now the Cleveland Regional Hospital, just north of Kingwood, 
where he had been recruited to come from South Carolina in 1989, several months 
after he had completed his residency and entered private practice.  Besides being licensed in Texas and 
South Carolina, Baker was also licensed in Mississippi, although his application 
there had initially been denied because he had forged his partner’s and office 
manager’s names to it.
Baker’s 
application was considered by Columbia’s peer review committee, the Medical 
Executive Committee, comprised of doctors on Columbia’s staff whose 
responsibility it was to determine the qualifications and review the performance 
of all physicians permitted to practice there.  As already noted, Texas law provides 
that with certain exceptions, the proceedings and records of a peer review 
committee are confidential and communications to it are privileged from 
disclosure.[9]  The exceptions, insofar as they concern 
us here, allow peer review committees to share information with each other and 
with appropriate state and federal agencies, national accreditation bodies, the 
Texas State Board of Medical Examiners, and other states’ licensing boards.[10]  Columbia has asserted that privilege in 
this case.  Thus, the record is 
silent concerning what information the Committee did or did not obtain regarding 
Baker, and any deliberations it may or may not have had, not only in connection 
with his original application, but over the more than four years that he 
remained at Columbia.  From this 
silence, the rules of evidence permit no inference whatever to be drawn.[11]  We do know, however, that the Committee 
was charged with thoroughly and carefully investigating each physician who 
applied for privileges at Columbia.  
This involved obtaining extensive information from the physician and 
contacting licensing agencies, health care facilities, and other physicians who 
might have information about the applicant, as well as the National Practitioner 
Data Bank, to which information regarding the professional competence and 
conduct of physicians is required by federal regulation to be reported,[12] 
and law enforcement agencies, including the federal Drug Enforcement 
Agency.  We also know that after a 
physician was admitted to practice at Columbia, the Committee was responsible 
for constantly monitoring and reviewing his or her practice.
If 
the Committee’s initial investigation of Baker was thorough, it should have 
revealed that from 1988 to 1993 he had been sued ten times for malpractice.  The Committee should have inquired how 
these suits were resolved, and specifically, whether resolution involved a 
payment of money.  Our record does 
not reflect how each case was resolved, although it does indicate that some 
cases were resolved favorably to Baker.  
One lawsuit alleged that in 1990 at Cleveland he had operated on the 
wrong hip of a patient.  That suit 
was settled and dismissed six months after it was filed.
  Columbia granted Baker’s application in 
February 1994.  As with all doctors 
accepted at Columbia, Baker’s privileges were initially provisional and subject 
to further review.  Baker continued 
to work at Cleveland, where most of his practice was centered.  He also had privileges at two other 
hospitals in the vicinity.
In 
November 1994, Baker’s office manager, Janet Pickett, told the physician with 
whom Baker was then associated, Dr. Dan Parkinson, that she suspected Baker was 
abusing a prescription drug, hydrocodone, marketed as 
Lortab and Vicodin.  (The evidence in this case is that hydrocodone is a pain killer which, even when taken as 
prescribed, can cause drowsiness, mental clouding, lethargy, impairment of 
mental and physical performance, anxiety, fear, dysphoria, psychic dependence, and mood changes.)  Pickett had seen hundreds of empty drug 
sample containers in and around Baker’s office and private lavatory and had 
noticed that he experienced serious mood swings.  Parkinson had lived in Baker’s residence 
for a short time earlier in the year and had not noticed that Baker used drugs, 
but he had since heard that Cleveland had required Baker to submit to random 
drug testing.  Parkinson related 
Pickett’s concerns to Cleveland’s chief of surgery.  He also told Dr. Ronald Kerr, a 
physician at Columbia with whom he was hoping to associate, that he had 
second-hand information Baker was abusing drugs.  Baker had taken patients from Kerr and 
had refused to pay Kerr his part of the rent on the office they shared while 
working at Cleveland, and Kerr did not like him.  Kerr also did not approve of Baker’s 
treatment of patients, and even thought Baker posed a danger to them, although 
Kerr’s criticism tended to be general rather than specific.  Parkinson indicated that he intended to 
convey Pickett’s concerns to the Texas State Board of Medical Examiners, and 
Kerr agreed he should.
A 
few weeks later, Baker’s wife and other family members confronted him over his 
drug abuse, and in February 1995, he voluntarily entered a treatment program, 
admitting that he suffered from “a pattern of chemical abuse”.  He was released in May, but Pickett, who 
had supported Baker in obtaining treatment and remained his office manager until 
September or October, believed that he continued to use hydrocodone.  
Some time in 1995, Pickett reported Baker to the Board of Medical 
Examiners, and so did Parkinson.  In 
April 1996, the Board notified Baker that it was investigating “allegations of 
suspected substance abuse, [improper] care and treatment of [four named 
patients], and . . . your recurring health-care liability 
claims.”  As we have already noted, 
Cleveland and Columbia peer review committees were authorized to provide 
information to the Board and obtain information from it.
Nevertheless, 
in August 1996, Columbia removed Baker’s provisional status and gave him full 
privileges.  At the time, Kerr was 
chief of staff and chairman of the Medical Executive Committee.  In that role, he would have been 
expected to convey to the Committee whatever reservations he had about 
Baker.  The record does not reflect 
what, if anything, Kerr told the Committee.  Kerr testified at trial that if he had 
ever had concrete evidence Baker actually used drugs, he would have told the 
Committee, but he never had such evidence.  
Parkinson, too, would have been expected to convey his concerns to the 
Committee, especially since he had reported them to the Board of Medical 
Examiners.  Again, the record does 
not reflect whether Parkinson communicated with the Committee, but he testified 
at trial that while he had been associated with Baker for about a year and had 
operated with him 20-30 times, he had never seen Baker impaired or under the 
influence of drugs.  Based on 
personal observations, Parkinson thought Baker was an excellent surgeon.
The 
record is largely silent regarding the period from  August 1996, when Columbia granted Baker 
full privileges, to December 1997, when Baker separated from his wife.  In January 1998, Baker’s office manager 
(Pickett’s successor) resigned, stating in a letter to him:
 
Dr. Baker, you really need to get help and I don’t think you 
have any intention of getting it and I am not going to sit around while 
everything falls down around you.  I 
do want you to know I am aware of your drug problem and have been aware of it 
for several years.
 
Then 
on May 15, 1998, Cleveland suspended Baker from practice there after he operated 
on the wrong leg of a patient (a mistake similar to the one he was alleged to 
have made in 1990).  The record does 
not reflect that Columbia knew of the action taken by Cleveland.  Dr. Robert Rosen, who was chief of staff 
at Cleveland and therefore chairman of its peer review committee, also served on 
Columbia’s Committee, but he testified that he abstained from discussions at 
Columbia about doctors at Cleveland, like Baker, so that the peer review 
processes at the two hospitals would remain separate.  Furthermore, on June 12, Baker obtained 
a temporary restraining order prohibiting Cleveland and its agents from 
disclosing any information regarding his suspension.  The TRO was extended and did not expire 
until July 16, the day after the surgery that gave rise to the claims in this 
case.
In 
early July, Baker met with his wife at home to try to finalize their 
divorce.  While they were talking, 
he became increasingly agitated and suddenly grabbed her by the neck, attempting 
to strangle her.  Equally suddenly, 
he released her moments later and ran sobbing from the house, threatening to 
kill himself.  Baker’s wife 
described this erratic conduct as similar to the behavior he suffered while on 
drugs.  She did not inform Columbia 
of his actions or drug abuse, then or before, because she believed it already 
knew of Baker’s problems.
On 
July 15, Baker performed elective back surgery on Ricardo Romero, a 40-year-old 
longshoreman, whom Baker had been treating for about a year.  Baker was assisted by Dr. William Huie, an anesthesiologist.  During the surgery, Romero lost a lot of 
blood before Baker or anyone else noticed, and in the 45 minutes it took to 
prepare a transfusion, he lost almost all of the blood in his body.  As a result, Romero went into cardiac 
arrest, and though he was resuscitated, he suffered severe and permanent brain 
damage that has left him profoundly disabled and unable to care for 
himself.  There is no direct 
evidence that Baker was under the influence of drugs during the surgery, but an 
expert witness for Romero, Dr. John Eichhorn, 
testified that for a surgeon to allow so great a loss of blood during relatively 
routine back surgery was unheard of and was consistent with impairment.
Baker 
testified that Columbia suspended him after the Romero surgery, pending an 
investigation, but there was also evidence that he performed at least two 
surgeries at Columbia in September.  
His privileges were for a term of two years, which expired in August or 
September, and he did not apply to have them renewed.
A 
year later, on August 30, 1999, the Board of Medical Examiners notified Baker 
that it had decided to close its investigation “based on the information 
presently available.”  But on 
September 7, Cleveland informed Baker of its final decision to suspend his 
privileges permanently because of violations that included “numerous delinquent 
medical charts, failure to make daily rounds for all patients as required 
. . . , and failure to enter timely progress notes for all 
patients.”  Cleveland’s letter did 
not state that these were the sole reasons for its action, but neither did it 
mention drug abuse or lawsuits as a basis for its decision.
Romero’s 
wife, individually and on behalf of Romero and their three minor children (“the 
Romeros”, petitioners in this Court), sued Columbia, 
Baker, Huie, and others, but settled with all of the 
defendants except Columbia for about $2,386,000.  The plaintiffs alleged that Columbia’s 
negligence resulted in a delayed blood transfusion for Romero during surgery, 
and that it acted with malice in credentialing Baker to practice in the 
hospital.  The jury  found that Romero’s injury was caused by 
the negligence of Columbia, Baker, and Huie, and by 
the Hospital’s malice in credentialing Baker.  The Romeros 
requested that the finding of malicious credentialing be made by clear and 
convincing evidence, and the trial court, after expressing doubt about whether 
the heightened standard was appropriate for the liability issue (as opposed to 
the punitive damages issues), acceded to the request.  The jury was instructed that if they 
found liability under either theory, they should apportion responsibility for 
the injury, which they did: 40% to Columbia, 40% to Baker, and 20% to Huie.  The jury 
found actual damages of $28.6 million and punitive damages of $12 million.  Based on the verdict, the trial court 
determined awards for each plaintiff against Columbia that totaled a little over 
$25 million, including prejudgment interest, but under a high-low settlement 
agreement, the trial court rendered judgment for $11,440,000 in actual 
damages.
On 
appeal, Columbia complained that there was no clear and convincing evidence of 
malice, defined by statute as:
 
an act or omission:
 
(i)        which 
when viewed objectively from the standpoint of the actor at the time of its 
occurrence involves an extreme degree of risk, considering the probability and 
magnitude of the potential harm to others; and
 
(ii)       of which 
the actor has actual, subjective awareness of the risk involved, but 
nevertheless proceeds with conscious indifference to the rights, safety, or 
welfare of others.[13]
 
The 
court of appeals rejected Columbia’s argument that the heightened burden of 
proof the jury was instructed to apply C 
clear and convincing evidence, rather than a preponderance of the evidence C 
required a heightened standard of evidentiary review on appeal.[14]  The court thoroughly examined the 
evidence of malice and concluded that Baker posed an extreme risk to patients 
because of his drug abuse[15] 
(but not because of the lawsuits filed against him[16] 
or Kerr’s adverse opinion of him[17]).  The court also concluded that testimony 
about the kind of investigation Columbia would have been expected to make of 
Baker’s conduct under its peer review procedures was evidence that it acted 
accordingly and sufficient circumstantial evidence that as a result it must have 
known of Baker’s drug abuse.[18]  But the court could find no evidence 
that Columbia was consciously indifferent to the risk Baker’s impairment posed 
to his patients.[19]  Because of the silence of the record 
surrounding Columbia’s peer review proceedings, the court concluded that the 
Romeros could point to no evidence that Columbia had 
failed to take appropriate measures in response to Baker’s drug abuse.[20]  The court noted that the Romeros’ expert witness had offered his opinion that 
Columbia should not have allowed Baker to operate on Romero but concluded that 
the opinion had no factual basis to support it.[21]
Having 
determined that the trial court’s judgment could not rest on the jury’s finding 
of malicious credentialing, the court of appeals next considered whether the 
jury’s finding of negligence would support the judgment.[22]  Although Columbia did not challenge the 
negligence finding, it argued that the jury should not have been permitted to 
consider Columbia’s alleged malicious credentialing in apportioning 
responsibility.  The court agreed, 
finding it simply “inconceivable that the jury would find liability based on the 
two different acts, but not attribute some responsibility to both acts.”[23]  Because the jury would probably have 
apportioned responsibility differently had it been restricted to considering 
only Columbia’s negligence, the court concluded that judgment could not be 
rendered on the verdict.[24]  Accordingly, the court remanded the case 
for a new trial on negligence.
We 
granted the Romero plaintiffs’ petition for review.[25]
II
We 
turn first to the Romeros’ contention that there is 
evidence of malicious credentialing to support the trial court’s judgment.  The Romeros 
argue, and the court of appeals agreed,[26] 
that any evidence, more than a scintilla, will suffice.  But while this case has been pending 
before us, we have held, as Columbia argued in the court of appeals and again 
here, “that in reviewing the legal sufficiency of evidence to support a finding 
that must be proved by clear and convincing evidence, an appellate court must 
‘look at all the evidence in the light most favorable to the finding to 
determine whether a reasonable trier of fact could 
have formed a firm belief or conviction that its finding was true.’”[27] 
Malice must by statute be proved by clear and convincing evidence as a predicate 
to the recovery of exemplary damages,[28] 
but we know of no requirement that malice be proved by more than a preponderance 
of the evidence as an element of a malicious credentialing action to recover 
actual damages.  To recover actual 
damages, the Romeros were required to prove malicious 
credentialing only by a preponderance of the evidence; to recover exemplary 
damages, they were held to the higher standard of proof for malice.  The learned trial judge pointed out this 
distinction and suggested that the standards of proof be different in the 
liability question and the exemplary damages question.[29]  But the Romeros requested that the jury find malicious credentialing 
by clear and convincing evidence in order to establish liability, and the trial 
court acceded.  The sufficiency of 
the evidence must be measured by the jury charge when, as here, there has been 
no objection to it.[30]  Accordingly, we must hold the Romeros to the higher standard and review all of the 
evidence in the light most favorable to the verdict to determine whether a 
reasonable trier of fact could have formed a firm 
belief or conviction that Columbia acted with malice in credentialing Baker, 
although as we shall see, the Romeros cannot satisfy 
even the ordinary standard of review.
The 
parties do not dispute that a physician engaged in drug abuse presents an 
extreme risk to patients, and we will assume solely for purposes of argument, as 
the court of appeals concluded, that Columbia had actual, subjective awareness 
of the risk posed by Baker’s drug abuse, at least at one point in time.[31]  We focus, as did the court of appeals, 
on whether there is evidence that Columbia was consciously indifferent to this 
risk.  Regarding what steps a 
hospital can and should take when confronted with such a risk, the Romeros’ expert, Dr. John Eichhorn, testified as follows:
 
Q [by the Romeros’ counsel].  Are there steps that can be taken, Dr. 
Eichhorn, if the hospital suspects drug abuse or, in 
the words of Dr. Huie, has even an ounce of suspicion 
about drug abuse?  Are there steps 
that the committees can take in order to determine, A, whether suspension should 
take place or, B, whether some kind of testing should take 
place?
 
A.        Yes, 
definitely.
 
Q.        What 
should have been done in this case in your opinion?
 
A.        There 
are several parts to it.  One of the 
classic components is called a confrontation where the subject under question is 
brought in under controlled conditions and confronted first with the suspicions, 
the concerns C 
safety concerns in particular, of course C 
and then asked at that moment to provide an on-the-spot witnessed urine sample 
C 
and better, and actually this is what I have done C 
sample at the same time so you have both simultaneously completely unannounced 
and random.  That’s part 
one.
 
The other part is the investigation, and that includes: 
investigating with the other institutions, if any, where the physician has 
privileges; seeking, as we said before, peer-review-to-peer-review-committee 
information; launching their own investigation, starting with 
that.
 
On 
cross-examination, Dr. Eichhorn testified further:
 
Q [by Columbia’s counsel]. . . . [Y]ou are familiar with different options open to hospital 
committees [when a physician is suspected of abusing 
drugs]?
 
A.        
Yes.
 
Q.        Let 
me represent to you that these are some of the options Dr. Kerr discussed the 
other day with me that would be available to a hospital committee: monitoring, 
education, restrictions, termination, counseling, drug testing.  Would you agree that those are some of 
the available options?
 
A.        Some 
but not all.
 
Because 
of the confidentiality surrounding peer review proceedings, the record is 
largely silent on which, if any, of the steps outlined by Dr. Eichhorn Columbia did or did not take.  As we have already explained,[32] 
we cannot infer from this silence that Columbia either did or did not take steps 
it should have taken with respect to Baker’s drug abuse.  The Romeros 
complain that the court of appeals inferred from the record silence that, in 
their words, “the Hospital might have been doing something C 
‘we do not know what’ [quoting a phrase from the court of appeals’ opinion] 
C 
to address the known, extreme risk posed by the surgeon.”  The Romeros 
further argue that the court improperly concluded that an inference that 
Columbia exercised “some care” precluded a finding that it was consciously 
indifferent.  We think the Romeros misconstrue the court of appeals’ opinion, which 
said:
 
Because the Hospital invoked its confidentiality privilege, we 
do not know what the Hospital did in response to the information it had.  We do not know if it took any steps such 
as requiring Baker to submit urine samples, or monitoring Baker, or if it did 
nothing.  But one thing we do know: 
we cannot infer anything from this lack of information.[33]
 
We 
do not read the court of appeals’ opinion to draw any inferences favorable to 
Columbia from the record’s silence.
The 
record does establish, of course, that Columbia did not suspend Baker before 
Romero’s surgery, but the evidence we have just quoted above does not indicate 
that Columbia should have done so; to the contrary, Dr. Eichhorn plainly testified that a hospital should consider a 
number of measures before, and as an alternative to, suspension.  The Romeros 
argue that Dr. Eichhorn’s testimony relates only to 
suspected drug abuse, not proven, admitted drug abuse.  We are not convinced that Dr. Eichhorn’s testimony can fairly be read so narrowly, but if 
it could, there is nothing in the record to show that Columbia knew in July 1998 
that Baker had continued to use drugs since having been reported to the Board of 
Medical Examiners in 1995 or early 1996.  
More importantly, even if we disregard Dr. Eichhorn’s testimony that a hospital can and should take 
steps short of suspension in dealing with a physician engaged in drug abuse, the 
only evidence that Columbia should have suspended Baker before Romero’s surgery 
is in two brief passages of Dr. Eichhorn’s 
testimony.  The first occurred 
during his direct examination:
 
Q.        Was 
Dr. Baker still on the staff at the time of the Romero 
surgery?
 
A.        Yes, 
definitely.  Obviously.  He operated that 
day.
 
Q.        He 
had been suspended from Cleveland a couple months before?
 
A.        Yes, 
he had.
 
Q.        Is 
that what [Columbia] should have done in this case?
 
A.        Yes, 
definitely.
 
But 
there is no evidence that Cleveland suspended Baker for drug abuse.  Cleveland suspended Baker after he 
operated on the wrong leg of a patient and more than a year later gave as its 
reasons “violations [of Baker’s agreement with Cleveland] includ[ing] numerous delinquent 
medical charts, failure to make daily rounds for all patients as required by the 
Agreement, and failure to enter timely progress notes for all patients.”  If Dr. Eichhorn meant that Columbia should have suspended Baker for 
the same reasons Cleveland suspended him, there is no evidence that Columbia had 
any of those reasons C 
that is, no evidence that Baker’s charts at Columbia were delinquent, or his 
rounds irregular, or his progress notes tardy.  If Dr. Eichhorn meant that Columbia should have suspended Baker 
simply because Cleveland did, there is no evidence that Columbia knew of 
Cleveland’s action in May 1998, or even that it could have known.  The undisputed evidence is that peer 
review proceedings at Cleveland would have been kept confidential and separate, 
just as they were at Columbia, and that to ensure such confidentiality, Baker 
obtained a temporary restraining order prohibiting Cleveland from disclosing its 
actions.  That order did not expire 
until the day after Romero’s surgery.  
And if Dr. Eichhorn meant that Columbia should 
have suspended Baker whether it knew what Cleveland had done or why, simply 
because Baker should have been suspended, then he offered no support for his 
opinion.  “We have reiterated that 
‘a claim will not stand or fall on the mere ipse dixit of a credentialed witness.’”[34]
The 
only other testimony regarding whether Columbia should have suspended Baker 
before Romero’s surgery occurred during Dr. Eichhorn’s 
cross-examination as follows:
 
Q.        
You’ve indicated in this case in response to [the Romeros’ counsel’s] questions you thought that my client, 
[Columbia], was C 
acted with malice C
 
A.        Using 
the legal definition on the printout, yes.
Q.        I 
wasn’t quite done with my question, but let me ask it.  Your opinion was that we acted with 
malice to allow Dr. Baker to practice medicine at the hospital on the day of Mr. 
Romero’s surgery?
 
A.        
Correct.
 
The 
parties have not cited the direct testimony referred to, and we have not found 
it ourselves.  Here, as before, Dr. 
Eichhorn offered no support for his opinion.
There 
is no other evidence that Columbia should have suspended Baker to prevent him 
from operating on Romero.  The Romeros argue that Columbia should have required that 
another physician monitor Baker’s surgery, that anesthesiologists assisting him 
be warned of his impairment, and that Romero himself be warned of the risk.  The Romeros 
cite no evidence that Columbia should have done any of these things.  The Romeros 
argue that no expert testimony was needed to prove that a hospital should take 
such actions or suspend a physician impaired by drug abuse, but we 
disagree.  The necessity for expert 
testimony regarding the proper responses by a hospital to concerns of physician 
drug abuse is demonstrated by the Romeros’ own expert 
witness, Dr. Eichhorn, who testified extensively on 
the subject.  As he stated, Columbia 
had a number of alternatives in dealing with Baker, and as we have noted, the 
record is silent regarding what measures, if any, Columbia actually took.  Moreover, the Romeros have not pointed to evidence that Columbia knew 
Baker was impaired in July 1998, or for many months prior.
Lastly, 
the Romeros argue that the court of appeals should 
have considered evidence of Baker’s incompetence unrelated to his drug abuse 
C 
specifically, the lawsuits against him, the two wrong-limb surgeries, and Kerr’s 
opinion of him C 
in assessing evidence of malice.  
The court of appeals concluded that this evidence did not show that Baker 
posed an extreme degree of risk to his patients and consequently disregarded it 
before reaching the issue of malice.[35]  We think the court’s analysis was 
correct, but even if evidence of Baker’s incompetence were to be considered in 
assessing the evidence of malice, the conclusion would be the same: there is no 
evidence by Dr. Eichhorn or anyone else that questions 
about Baker’s competence required Columbia to keep him from operating on Romero 
as he did.
The 
court of appeals did not conclude, as the Romeros 
argue, that the mere possibility or inference that Columbia might have done 
something precluded a finding of malice.  
Rather, the court concluded that it could not infer from the lack of 
information that the hospital did nothing, and that there was no evidence “that 
when the Hospital discovered Baker’s substance abuse, it should have refused 
Baker active staff privileges in 1996 or withdrawn them at some point later.”[36]  We examined the Romeros quite carefully on this point at oral argument, and 
it was a subject of their post-submission brief.  As proof of Columbia’s conscious 
disregard of Baker’s drug abuse, the Romeros have 
pointed to no evidence other than what we have cited, and we have found none in 
our own review of the record.  We 
are inclined to agree with the court of appeals that Dr. Eichhorn’s two unsupported statements of opinion are legally 
insufficient to show that Columbia was consciously indifferent to the risk 
Baker’s drug use posed to patients.  
But as we have explained, the evidence of malice in this case must meet a 
higher standard; it must produce firm belief or conviction, and it does not do 
so.
Accordingly, 
we conclude that the court of appeals was correct in holding that there was no 
evidence of malice to support a judgment against Columbia for malicious 
credentialing.  The Romeros complain that the peer review privilege effectively 
precludes recovery for malicious credentialing,[37] 
but that complaint in this case, at least, is overstated.  Had the Romeros offered evidence that Columbia should not have 
allowed Baker to operate on Romero, there would be some evidence of malice, and 
had such evidence been convincing, it would support recovery.  We do not doubt that such evidence of 
malice is difficult to come by, but the Legislature has made recovery for 
improper credentialing of physicians difficult.  Indeed, since this case was tried, the 
Legislature has amended the definition of malice to mean “a specific intent by 
the defendant to cause substantial injury or harm to the claimant”, eliminating 
the alternative definition of conscious indifference to a known, excessive 
risk.[38]  Thus, the Legislature has made it still 
more difficult to establish liability for improperly credentialing a 
physician.
III
We 
now consider whether the judgment for the Romeros can 
rest on the jury’s finding of negligence unchallenged on appeal.  The court of appeals concluded that 
reversal and remand was required because of error in the jury question regarding 
the apportionment of responsibility.[39]  Because the jury was not asked to find 
the percentage of fault due solely to Columbia’s negligence, the portion of the 
damages for which it is liable cannot be determined.  The Romeros 
argue that submission of the apportionment question was not reversible error; 
that Columbia did not preserve its complaint to the question; that to require a 
different submission is inconsistent with the rule that jury questions be 
submitted in broad form whenever feasible; and that retrial, if necessary, 
should be limited to the apportionment issue.  We consider each argument in turn.
A
The 
jury was instructed to apportion responsibility for Romero’s injury if they 
found more than one person negligent, as they did.  The jury was then asked:
 
What percentage of the conduct that caused the occurrence or 
injury do you find to be attributable to each of those found by you, in your 
answer to Question No. 1 and/or 2 to have caused the occurrence of 
injury?
 
In 
answer to Question 1, the jury found that Romero’s injury was caused by the 
negligence of Columbia, Baker, and Huie.  In answer to Question 2, the jury found 
that Columbia’s malicious credentialing of Baker also caused Romero’s 
injury.  Thus, the jury was 
instructed to apportion responsibility among Columbia, Baker, and Huie, and in doing so, to consider Columbia’s malicious 
credentialing of Baker.  Since there 
was no evidence of malicious credentialing, the jury should not have been 
allowed to consider that claim in setting Columbia’s percentage of 
responsibility.
Rule 
44.1(a) of the Texas Rules of Appellate Procedure provides that error in the 
trial court properly complained of requires reversal of the judgment on appeal 
if it “(1) probably caused the rendition of an improper judgment; or (2) 
probably prevented the appellant from properly presenting the case to the court 
of appeals.”[40]  Had the jury been confined to 
considering Columbia’s role in causing Romero’s injury by negligently delaying a 
blood transfusion for him during surgery, it may well have decided on a figure 
other than 40%.  Indeed, the court 
of appeals found it “hard to believe that the 40% liability the jury attributed 
to [Columbia] in question 3 was not based (1) partly on the liability it found 
for negligence (question 1), and (2) partly on the liability it found for 
malicious credentialing (question 2).”[41]  “[W]e do not have to guess if the 
erroneously submitted question impacted the liability or damages answers,” the 
court explained.  “We know with 
almost certainty that it did impact the answers.”[42]  Thus, the court held that the error in 
the apportionment question was reversible under Rule 44.1(a)(1).
The 
difficulty with the court of appeals’ analysis of whether error in the 
apportionment question probably resulted in an improper verdict, the concern 
under Rule 44.1(a)(1), is that it assumes that the jury has determined 
comparative fault percentages with both claims against Columbia in mind.  The Romeros do 
not attempt to argue with the court of appeals’ reasoning that the jury, once 
having found Columbia to have been 40% at fault because of both its 
negligence and its malicious credentialing, would thereafter 
almost certainly have answered with a different figure had they then been 
asked to reapportion responsibility considering only Columbia’s negligence.  This, they complain, is not the relevant 
issue.  Rather, they argue, had the 
jury been instructed in the first instance to consider only evidence of 
Columbia’s negligence, they could easily have assessed Columbia’s proportionate 
responsibility at the same 40% figure.  
Because there is evidence entirely apart from the malicious credentialing 
claim to support the jury’s finding that Columbia was 40% at fault, the Romeros argue, any error in submitting the apportionment 
question cannot be said to have probably resulted in an improper judgment.
We 
rejected this argument in Crown Life Insurance Co. v. Casteel[43] 
and Harris County v. Smith,[44] 
based on Rule 44.1(a)(2).  Even if 
the jury could still have made the same apportionment of fault, the error 
in the question is nevertheless reversible because it effectively prevents 
Columbia from complaining on appeal that they would not have done 
so.  Thus, in Crown Life 
Insurance Co. v. Casteel, we held that “submitting invalid theories of 
liability in a single broad‑form jury question is harmful error when it cannot 
be determined whether the jury based its verdict on one or more of the invalid 
theories.”[45]  Similarly, in Harris County v. 
Smith, we held that a broad-form question about damages cannot include 
elements for which there is no evidence.[46]  In Harris County, we 
explained:
 
In Casteel, we reaffirmed our reasoning in Lancaster 
v. Fitch, 112 Tex. 293, 246 S.W. 1015 (1923), where this Court recognized 
the inherent harm to the administration of justice caused by mixing valid and 
invalid liability theories in a single broad‑form liability question.  Casteel, 22 S.W.3d at 389.  The same year we decided 
Lancaster, we applied its reasoning to a similar situation involving a 
broad‑form damages question.  
See Eastern Tex. Elec. Co. v. Baker, 254 S.W. 933, 934‑35 
(Tex. 1923).  In Eastern Texas 
Electric, the trial court submitted a single broad damage issue and 
instructed the jury to consider past and future mental and physical pain in 
awarding damages even though there was no evidence of future physical pain.  The court of appeals held that the trial 
court had erred in instructing the jury to consider future pain but concluded 
that the error was harmless because evidence of past mental and physical pain 
was sufficient to support the award.  
This Court reversed, concluding that the harmless error standard “was not 
intended to deprive a party to a suit of a substantial right,” namely, “the 
right to have the damages assessed against it by the jury under proper 
instructions submitting only the elements of damage as raised by the pleadings, 
and supported by evidence.”  
Id. at 934.   
Because it was “not possible for an appellate court to say the jury did 
not consider this erroneous charge in arriving at the amount of damage,” this 
Court reversed and remanded for a new trial, citing Lancaster.  Id. at 935.
 
Just as in 1923, a litigant today has a right to a fair trial 
before a jury properly instructed on the issues “authorized and supported by the 
law governing the case.”  
Casteel, 22 S.W.3d at 389 (quoting Lancaster v. Fitch, 246 
S.W. at 1016).  We conclude that the 
trial court erred in overruling Harris County’s timely and specific objection to 
the charge, which mixed valid and invalid elements of damages in a single 
broad‑form submission, and that such error was harmful because it prevented the 
appellate court from determining “whether the jury based its verdict on an 
improperly submitted invalid” element of damage.  Casteel, 22 S.W.3d at 388;  see also Tex. R. App. P. 61.1(b).[47]
 
The 
argument was made in Harris County that even if it is reversible error to 
include legally invalid claims with legally valid ones in a single jury 
question, the same rule should not apply when all the claims are valid but some 
lack support in the evidence.[48]  While the jury might well be misled by 
legally erroneous instructions or questions, since they are not expected to know 
the law and are instead obliged to follow the law given them in the charge, they 
are certainly expected to know and weigh the evidence and C 
the argument goes C 
are therefore not likely to be influenced in making their findings by being 
allowed to consider factors without evidentiary support.[49]  We specifically rejected this 
argument,[50] 
and this case illustrates why.  
Having found malicious credentialing, the jury could not conceivably have 
ignored that finding in apportioning responsibility.  While in other instances a jury may 
simply ignore a factor in the charge that lacks evidentiary support, there are 
other instances C 
and this case is one C 
where the jury is as misled by the inclusion of a claim without evidentiary 
support as by a legally erroneous instruction.  In all circumstances in which “[a] trial 
court’s error in instructing a jury to consider erroneous matters, whether an 
invalid liability theory or an unsupported element of damage, prevents the 
appellant from demonstrating the consequences of the error on appeal”,[51] 
the same analysis must be applied.
We 
do not hold that the error of including a factually unsupported claim in a 
broad-form jury question is always reversible.  Rule 44.1(a)(2) requires that the error, 
to be reversible, “probably prevented the appellant from properly presenting the 
case to the court of appeals.”[52]  But unless the appellate court is 
“reasonably certain that the jury was not significantly influenced by issues 
erroneously submitted to it”,[53] 
the error is reversible.  We have no 
such reasonable certainty here; on the contrary, we are reasonably certain that 
the jury was significantly influenced by the erroneous inclusion of the 
factually-unsupported malicious credentialing claim in the apportionment 
question.  Accordingly, we conclude 
that the error requires reversal of the judgment.
B
The 
Romeros argue that Columbia did not preserve its 
complaint to this error.  The record 
we have of objections to the jury charge suggests that the trial court and 
counsel discussed the charge the day before without a court reporter 
present.  It is clear that the 
learned trial judge identified the problem with the apportionment question and 
suggested that it could be avoided by submitting two such questions to the 
jury.  The next day, on the record, 
Columbia objected to the submission of a question on malicious credentialing “on 
the grounds there is no evidence to warrant its submission, no evidence of 
malice, and no evidence under the clear and convincing standard of malice.”  The court overruled the objection.  Columbia then objected to the submission 
of a single apportionment question, although it declined to request two 
apportionment questions, as the court had suggested and to which the Romeros had objected.  
The record reflects the following:
 
[Columbia’s counsel]: In Question No. 3, we object to 
. . . the inclusion of the Question No. 2 inquiry, . . . 
what we believe is a legally non-viable theory C 
which is the malice issue C 
. . . along with a negligence theory resulting in a single percentage 
inquiry, which, of course, as a result of [Casteel] would basically make 
it impossible to determine that there was a legally legitimate basis upon which 
rendition of judgment could be had.
 
THE COURT: That’s why I wanted to submit a separate percentage 
question for you.
 
[Columbia’s counsel]: Well, I understand that, Your 
Honor.
 
THE COURT: No one wanted it.
 
[Columbia’s counsel]: We think that’s equally inappropriate as 
particularly a comment on the weight.  
But nonetheless, to the extent we have to make such an objection, the 
objection to Question No. 3 is . . . that . . . the 
predicate language . . . includes Question No. 2.  And assuming that there is an answer to 
Question No. 2, then Question No. 3 will result in a number which we believe 
will not be capable of . . . legitimately supporting the rendition of 
an appropriate judgment.  And for 
that reason, we object to the C 
what in essence is the predicate language 
. . . .
 
THE COURT: I’d be glad to cure that for 
you.
 
[Columbia’s counsel]: Your Honor, we discussed this yesterday 
afternoon, and I think at that time I indicated that I did not want to sandbag 
the court.
 
THE COURT: Now, I understand you’re making the objection, but 
you know, it is my belief that there ought to be two predicate 
questions.
 
[Columbia’s counsel]: Two causation 
questions?
 
THE COURT: Two Question No. 3 questions.
 
[Columbia’s counsel]: Two percentage 
questions?
 
THE COURT: Two percentage questions.  And that would cure the 
problem.
 
[Columbia’s counsel]: I understand the court’s 
position.
 
THE COURT: Okay.
 
[Columbia’s counsel]: We also believe that is inappropriate, 
but be that as it may, I understand the court did tender to us two percentage 
questions.
 
[The Romeros’ counsel]: Your Honor, 
I’m not sure I understand the objection, because although the court suggests 
having two percentage questions, I understand [Columbia] to be telling the court 
that they would object to that question, but they also object to this question 
C
 
THE COURT: Right.
 
[The Romeros’ counsel]: C 
under [Casteel] because it supposedly includes an improper C
 
THE COURT: Yes, but you objected to two percentage questions, 
too.  I just want that to be clear 
on the record.
 
The 
Romeros argue Columbia’s objection did not state its 
complaint to the submission of a single apportionment question “with sufficient 
specificity to make the trial court aware of the complaint”,[54] 
as required by Rule 33.1(a)(1)(A) of the Texas Rules of Appellate 
Procedure.  Their argument is not 
that Columbia’s objection was unclear or that it was not understood by the trial 
court; rather, it is that Columbia did not specify that it wanted two 
apportionment questions instead of one.  
Columbia stated to the trial court that the submission of two questions 
was inappropriate as a “comment on the weight”.Since 
the submission of two questions would have cured the problem of which Columbia 
now complains, the Romeros argue that Columbia’s 
objections lacked specificity and therefore did not preserve their complaint for 
appeal.
But 
the Romeros’ argument simply ignores the fact that 
Columbia’s objection to the malicious credentialing question was correct, and 
had the trial court sustained it, there would have been no problem with the 
apportionment question.  The 
overruling of that objection created the problem in the single apportionment 
question that the Romeros requested, to which Columbia 
also objected, also correctly.  No 
more was required of Columbia to preserve its complaints.
We 
need not consider whether Columbia was required to object not only to the lack 
of evidence for the malicious credentialing claim but also to the form of the 
apportionment question that included the claim[55] 
because it did both.  Also, neither 
the Romeros nor Columbia argues that the error 
preservation question is answered by Rule 278 of the Texas Rules of Civil 
Procedure, and so we do not consider the impact of that rule here.[56]  We conclude that Columbia preserved its 
complaint for appeal.
C
The 
Romeros argue that to apply the rule of Casteel 
and Harris County in this case C 
encourages, if not requires, separate submission of 
every theory of liability, every combination of theories, and every combination 
of defendants together with separate apportionment and damages questions for 
every theory, combination of theories, and combination of defendants. In this 
case, the jury charge would have needed to include more than 175 
issues.
This 
is simply untrue.  The jury charge 
in this case needed one less question C 
the question on malicious credentialing, for which there was no evidence C 
to be free of error, and reversal could have been avoided with one more 
question, which the trial court offered to the Romeros and they rejected.  The reversible error rule of 
Casteel and Harris County neither encourages nor requires parties 
to submit separate questions for every possible issue or combination of issues; 
the rule does both encourage and require parties not to submit issues 
that have no basis in law and fact in such a way that the error cannot be 
corrected without retrial.  If at 
the close of evidence a party continues to assert a claim without knowing 
whether it is recognized at law or supported by the evidence, the party has 
three choices: he can request that the claim be included with others and run the 
risk of reversal and a new trial, request that the claim be submitted to the 
jury separately to avoid that risk, or abandon the claim altogether.  The Romeros’ 
argument assumes that it is so commonplace to come to the end of a jury trial 
and have no idea what claims are still legally and factually valid that the only 
safe course to avoid retrial is to parse out every issue in a separate jury 
question.  Nothing in our review of 
thousands of verdicts rendered by juries across the State suggests that there is 
any validity to the assumption.
The 
Romeros argue that we have retreated from the mandate 
of Rule 277 of the Texas Rules of Civil Procedure that issues must be submitted 
to a jury in broad form “whenever feasible”.[57]  This Court’s adoption of broad-form jury 
submissions was intended to simplify jury charges for the benefit of the jury, 
the parties, and the trial court.  
It was certainly never intended to permit, and therefore encourage, more 
error in a jury charge.  We continue 
to believe, as we stated in Harris County, that “[w]hen properly 
utilized, broad‑form submission can simplify charge conferences and provide more 
comprehensible questions for the jury.”[58]  But “it is not always practicable to 
submit every issue in a case broadly,”[59] 
and broad-form submission cannot be used to broaden the harmless error rule to 
deny a party the correct charge to which it would otherwise be entitled.
D
Finally, 
the Romeros argue that any error in the apportionment 
question did not affect the jury’s findings of negligence or actual damages, and 
therefore if there must be a new trial, it should be limited to the 
apportionment issue.  Columbia 
responds that a new trial of the negligence claim is necessary because the 
jury’s malicious credentialing finding tainted not only their apportionment 
findings but their damages findings.  
Columbia is certainly correct with respect to the punitive damages 
findings, and for that reason alone, a new trial on the entire negligence claim 
is required.[60]
*          
*          
*          
*          
*
For 
these reasons, the judgment of the court of appeals is
                                                                                                                                      
Affirmed.
 
___________________________
Nathan L. Hecht
Justice
Opinion 
delivered:  May 27, 2005




[1] Tex. Occ. 
Code § 160.010(b) (“A cause of action does not accrue against 
. . . a health care entity from any act, statement, determination or 
recommendation made . . . without malice, in the course of medical 
peer review.”) & (c) (“A . . . health care entity that, without 
malice, participates in medical peer review . . . is immune from any 
civil liability arising from that act.”) (formerly Tex. Rev. Civ. Stat. Ann. art. 4495b, 
§ 5.06(l)-(m); Act of June 1, 1987, 70th Leg., R.S., ch. 596, § 18, 1987 Tex. Gen. Laws 2325, 2335); 
id. § 151.002(7) (“‘Medical peer review’ . . . means the 
evaluation of medical and health care services, including evaluation of the 
qualifications of professional health care practitioners and of patient care 
provided by those practitioners.”) (formerly Tex. Rev. Civ. Stat. Ann. art. 4495b, 
§ 1.03(a)(9); Act of June 1, 1987, 70th Leg., R.S., ch. 596, § 1, 1987 Tex. Gen. Laws 2325, 2326); St. 
Luke’s Episcopal Hosp. v. Agbor, 952 S.W.2d 503, 
505-507 (Tex. 1997).

[2] Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, formerly 
Tex. Civ. Prac. & Rem. Code 
§ 41.001(7)(B) (“'Malice’ means . . . (B) an act or omission: 
(i) which when viewed objectively from the standpoint 
of the actor at the time of its occurrence involves an extreme degree of risk, 
considering the probability and magnitude of the potential harm to others; and 
(ii) of which the actor has actual, subjective awareness of the risk involved, 
but nevertheless proceeds with conscious indifference to the rights, safety, or 
welfare of others.”); St. Luke’s, 952 S.W.2d at 506.  The Legislature has since amended 
subsection 41.007(7) to delete paragraph (B).  Act of June 2, 2003, 78th Leg., R.S., 
ch. 204, §§ 13.02, 23.02 (a), (d), 2003 Tex. Gen. 
Laws 847, 887, 898-899 (applicable to actions filed on or after September 1, 
2003).  Subsection 41.001(7) now 
provides: “‘Malice’ means a specific intent by the defendant to cause 
substantial injury or harm to the claimant.”

[3] Tex. Occ. 
Code § 160.007(a) (“Except as otherwise provided by this subtitle, 
each proceeding or record of a medical peer review committee is confidential, 
and any communication made to a medical peer review committee is privileged.”); 
Tex. Health & Safety Code 
§ 161.032(a) (“The records and proceedings of a medical committee are 
confidential and are not subject to court subpoena.”); Memorial Hosp.‑The 
Woodlands v. McCown, 927 S.W.2d 1, 2 (Tex. 1996) (holding that “documents 
and files generated for and by a hospital credentialing committee in its 
investigation and review of a physician's initial application for staff 
privileges are protected from discovery”); Irving Healthcare Sys. v. 
Brooks, 927 S.W.2d 12, 14 (Tex. 1996) (holding that “documents and 
communications relating to proceedings of medical peer review committees are 
protected from discovery”); Brownwood Reg’l Hosp. 
v. Eleventh Court of Appeals, 927 S.W.2d 24, 25 (Tex. 1996) (per curiam) (holding that “a hospital’s records relating to its 
initial grant of staff privileges to a physician are protected from discovery in 
a suit that alleges medical malpractice against the physician and negligent 
credentialing against the hospital”).

[4] Tex. R. 
Evid. 513(a) (“the claim of a privilege, whether in the present 
proceeding or upon a prior occasion, is not a proper subject of comment by judge 
or counsel, and no inference may be drawn therefrom.”).

[5] 102 S.W.3d 135, 155 (Tex. App.CHouston [14th Dist.] 2003).    

[6] Tex. R. Civ. 
P. 277 (“In all jury cases the court shall, whenever feasible, submit the 
cause upon broad-form questions.”).

[7] Harris County v. Smith, 96 S.W.3d 230 (Tex. 
2002); Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378 (Tex. 
2000).

[8] 102 S.W.3d at 160.

[9] See supra note 3.

[10] Tex. Occ. 
Code § 160.007(c) (“A record or proceeding of a medical peer review 
committee or a written or oral communication made to the committee may be 
disclosed to: (1) another medical peer review committee; (2) an appropriate 
state or federal agency; (3) a national accreditation body; (4) the board; or 
(5) the state board of registration or licensing of physicians of another 
state.”).

[11] See supra note 4.

[12] 45 C.F.R. part 60 (2004).

[13] See supra note 2; 102 S.W.3d at 
143.

[14] 102 S.W.3d at 145.

[15] Id. at 147-148.

[16] Id. at 148-150.

[17] Id. at 150-151.

[18] Id. at 151-153.

[19] Id. at 153-155.

[20] Id.

[21] Id. at 154 n.12.

[22] Id. at 155-160.

[23] Id. at 159.

[24] See Tex. 
R. App. P. 44.1(a).

[25] 47 Tex. Sup. Ct. J. 453 (March 29, 
2004).

[26] 102 S.W.3d at 145 n.6.

[27] Southwestern Bell Tel. Co. v. Garza, ___ S.W.3d 
___, ___ (Tex. 2004) (quoting In re J.F.C., 96 S.W.3d 256, 266 (Tex. 
2002)).

[28] Tex. Civ. Prac. 
& Rem. Code § 41.003(a)-(b).

[29] “THE COURT: Well, you know what I think, firstly, that 
the underlying [liability] question should be a preponderance of the evidence, 
then you have clear and convincing on top of it that gets you to malice [for 
exemplary damages].  But that’s not 
what the plaintiffs wanted, so I didn’t submit it that way.”  See also Tex. R. Civ. P. 226a, part III (amended 
Feb. 1, 2005).

[30] Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001) (stating that an 
assessment of the evidence “must be made in light of the jury charge that the 
district court gave without objection”); City of Forth Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000) (“Since neither 
party objected to this instruction [regarding malice], we are bound to review 
the evidence in light of this definition.”); Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 
2000) (“[I]t is the court’s charge, not some other unidentified law, that 
measures the sufficiency of the evidence when the opposing party fails to object 
to the charge.”); Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568 
(Tex. 1985).

[31] 102 S.W.3d at 146-148, 
151-52.

[32] See supra note 4.

[33] 102 S.W.3d at 154.

[34] Volkswagen of America, Inc. v. Ramirez, ___ 
S.W.3d ___, ___ (Tex. 2004) (quoting Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 
227, 232 (Tex. 2004); Burrow v. Arce, 997 
S.W.2d 229, 235 (Tex. 1999); Gammill v. Jack 
Williams Chevrolet, Inc., 972 S.W.2d 713, 726‑727 (Tex. 1998); Merrell 
Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711‑712 (Tex. 1997); Schaefer 
v. Texas Employers’ Ins. Ass’n, 612 S.W.2d 199, 
202‑204 (Tex. 1980)).

[35] 102 S.W.3d at 146.

[36] Id. at 154.

[37] See St. Luke’s Episcopal Hospital v. Agbor, 952 S.W.2d 503, 512 (Tex. 1997) (Phillips, C.J., 
dissenting) (“I find it difficult to conceive that a hospital would credential 
its doctors with either the intent to harm patients or with such reckless 
disregard for their welfare as to establish malice.  Even if such a case were to exist, 
however, a plaintiff would not be able to prove it because . . . of 
the peer review [privilege].”).

[38] See supra note 2.

[39] 102 S.W.3d at 159-160.

[40] Tex. R. App. 
P. 44.1(a); accord Tex. R. 
App. P. 61.1 (applicable to the Supreme 
Court).

[41] 102 S.W.3d at 159.

[42] Id.

[43] 22 S.W.3d 378 (Tex. 2000).

[44] 96 S.W.3d 230 (Tex. 2002).

[45] 22 S.W.3d at 381.

[46] 96 S.W.3d at 233-234.

[47] Id.

[48] Id. at 234 (citing Griffin v. United 
States, 502 U.S. 46 (1991)).

[49] See id. at 238-239 (O’Neill, J., 
dissenting).

[50] Id. at 234-235.

[51] Id. at 233.

[52] Tex. R. App. 
P. 44.1(a)(2).

[53] Braun v. Flint, 731 F.2d 1205, 1206 (5th Cir. 
1984)  (quoting E.I. DuPont de 
Nemours v. Berkley & Co., 620 F.2d 1247, 1258 n. 8 (8th Cir.1980); 
Baron v. Suffolk County Sheriff’s Dep’t, 402 F.3d 225, 244 (1st Cir. 
2005).

[54] Tex. R. App. 
P. 33.1(a)(1)(A).

[55] Cf. Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1124 (5th Cir. 1988) (calling 
the issue whether an objection must be made to the form of the submission “a 
close and difficult question”).

[56] Tex. R. Civ. 
P. 278 (“Failure to submit a question shall not be deemed a ground for 
reversal of the judgment, unless its submission, in substantially correct 
wording, has been requested in writing and tendered by the party complaining of 
the judgment; provided, however, that objection to such failure shall suffice in 
such respect if the question is one relied upon by the opposing party.  Failure to submit a definition or 
instruction shall not be deemed a ground for reversal of the judgment unless a 
substantially correct definition or instruction has been requested in writing 
and tendered by the party complaining of the 
judgment.”).

[57] Tex. R. Civ. 
P. 277 (“In all jury cases the court shall, whenever feasible, submit the 
cause upon broad-form questions.”).

[58] Harris County v. Smith, 96 S.W.3d 230, 235 (Tex. 
2002).

[59] Id.

[60] Tex. R. App. 
P. 61.2 (“The Court may not order a separate trial solely on unliquidated damages if liability is 
contested.”).